**CITY OF GREENWOOD VILLAGE,**
Appellant/Cross–Appellee,

v.

**PETITIONERS FOR the PROPOSED CITY OF CENTENNIAL,**

Appellee/Cross–Appellant.

No. 99SA297.

Supreme Court of Colorado,
En Banc.

June 26, 2000.

Rehearing Denied July 17, 2000.

Hayes, Phillips & Maloney, P.C., Herbert C. Phillips, Kendra L. Carberry, Denver, Colorado, Attorneys for Appellant/Cross-Appellee.

Collins, Cockrel & Cole, P.C., Robert G. Cole, Derek G. Passarelli, Denver, Colorado, Attorneys for Appellee/Cross-Appellant.

Justice HOBBS delivered the Opinion of the Court.

We transferred this appeal from the court of appeals to determine whether the proposed City of Centennial (Centennial) may proceed with its incorporation election or whether the City of Greenwood Village (Greenwood Village) may hold its annexation elections first. On the basis of the 1965 Municipal Annexation Act (1965 Act) and a 1999 amendment thereto (1999 Act), the District Court for Arapahoe County (district court) ruled that the Centennial incorporation election would occur first. It held, nevertheless, that the 1999 Act unconstitutionally impaired a pre-annexation agreement between Greenwood Village and the Highland Park Association (Highland Park) involving a portion of the affected area. We agree with the district court that the Centennial incorporation proceeding may continue, with the Greenwood Village annexation proceedings held in abeyance, pursuant to section 31–12–118, 9 C.R.S. (1999), but we disagree that the 1999 Act unconstitutionally impairs the Highland Park pre-annexation agreement.

## I.

Greenwood Village is a home rule city located astride the Highway I–25 corridor in the southeast Denver metropolitan area. Its boundaries extend approximately from the cities of Littleton and Englewood on the west, Cherry Hills Village and the City and County of Denver at East Belleview Avenue on the north, and the Cherry Creek State Park on the east. To the south of Greenwood Village is a rapidly urbanizing unincorporated area of Arapahoe County running east and west of Highway I–25, to which Centennial and Greenwood Village stake their claims.

If approved by the voters, Centennial would extend approximately from the City of Littleton on the west, the City of Greenwood Village at East Orchard Road through Cherry Creek State Park on the north, the City of Aurora on the east, and East County Line Road and the Centennial Airport on the south, with certain exceptions. On the other hand, if the voters first approve the Greenwood Village annexations, much of this area of unincorporated Arapahoe County would become part of Greenwood Village, rendering establishment of the new city unviable.

This controversy over incorporation versus annexation commenced in October of 1998. On October 2, 1998, a petition for the Cherry Crest Annexation was filed with the Greenwood Village City Clerk. A petition for the Greenwood South East Annexation followed on October 12, 1998. On October 19, 1998, a petition was filed in the district court for incorporation of Centennial. That same day, Greenwood Village scheduled public hearings for December 7, 1998, regarding the Cherry Crest and South East annexations. On November 16, 1998, an amended Centennial petition for incorporation was filed in the district court.

Following hearings on cross-motions for dismissal under C.R.C.P. 12(b)(1), the district court on December 2, 1998, entered its findings of fact and conclusions of law determining that: (1) the amended Centennial petition was defective on its face and must be dismissed; (2) because of this, the court did not have jurisdiction to authorize the Centennial incorporation election; and (3) judicial review of Greenwood's annexations must await adoption of that city's annexation ordinances.

On December 7, 1998, Greenwood Village adopted resolutions pertaining to the Greenwood South East and Greenwood South West annexations. On December 18, 1998, the district court entered an order for the appointment of election commissioners and the holding of an election on the South East annexation. That same day, Centennial filed a new petition for incorporation in the district court. On December 21, 1998, Greenwood Village adopted its annexation ordinance for the Greenwood South East property. On January 25, 1999, Greenwood Village held its hearing on the Greenwood South West annexation and adopted its ordinance on first reading to annex that property.

On January 19 and February 1, 1999, no annexation election having yet been conducted, the district court held hearings on the sufficiency of the new Centennial incorporation petition. At 1:35 p.m. on February 1, the Governor signed House Bill 99–1099 (the 1999 Act), which amended section 31–12–118 effective immediately to provide for holding an annexation proceeding in abeyance pending a conflicting incorporation proceeding involving a proposed city of over 75,000 inhabitants. *See* Act approved Feb. 1, 1999, Ch. 1, 1999 Colo. Sess. Laws 1–3.

On April 8, 1999, following additional briefing and hearing, the district court entered its findings of fact and conclusions of law, determining that: (1) the Centennial petition filed December 18, 1998, satisfied all of the statutory requirements for an incorporation election; (2) both the 1965 and 1999 Acts provided for the Centennial incorporation election to precede the Greenwood Village annexation elections; (3) the 1999 Act was not unconstitutional special or retrospective legislation; (4) the Centennial incorporation proceeding may continue, with the Greenwood Village annexation proceedings being held in abeyance pursuant to the 1999 Act; and (5) the 1999 Act unconstitutionally impaired a pre-annexation agreement between the Highland Park Association and Greenwood Village.

The district court issued a C.R.C.P. 54(b) certification for immediate appeal of its entire ruling, and stayed implementation of its orders pending appeal. Centennial and Greenwood Village cross-appealed to the court of appeals. The court of appeals then filed with us a request for determination of jurisdiction, pursuant to section 13–4–110(1)(a), 5 C.R.S. (1999), based on its apparent lack of jurisdiction under section 13–4–102(1)(b), 5 C.R.S. (1999), because of the district court's determination that the 1999 Act unconstitutionally impaired the Greenwood Village pre-annexation agreement with Highland Park.

We assumed jurisdiction over the competing appeals of Greenwood Village [1] and Centennial [2] and now enter our judgment.

## II.

We hold that Centennial's incorporation proceeding may continue, with the Greenwood Village annexation proceedings being held in abeyance, pursuant to sections 31–12–118 and –118.5, as amended. We determine that: (1) Greenwood Village has standing to contest whether the 1999 Act is special or retrospective legislation or impairs a vested contract right under the city's pre-annexation agreement with Highland Park, contrary to Colorado's constitution, but (2) Greenwood Village does not have standing to contest the 1999 Act on the basis of citizen voting rights. We hold that the 1999 Act does not violate Colorado's prohibitions against special legislation, retrospective legislation, or impairment of contract.

### A. Colorado's Incorporation and Annexation Laws

We first review Colorado's incorporation and annexation laws as they apply to this case. We then turn to the standing of Greenwood Village to raise its constitutional challenges to the 1999 Act, the applicable standard of review, and the issues of special

and retrospective legislation and impairment of contract.

### 1. The Setting and Changing of Municipal Boundaries

▮▮▮ Providing for the setting of municipal boundaries, whether by incorporation or annexation, is a prerogative of the General Assembly. *See Fort Collins–Loveland Water Dist. v. City of Fort Collins*, 174 Colo. 79, 82, 482 P.2d 986, 988 (1971). Eleven years after statehood, we held that the legislature may establish general laws for determining the boundaries of towns and cities. *See Rhodes v. Fleming*, 10 Colo. 553, 556–58, 16 P. 298, 299–300 (1887). In matters of incorporation or annexation, the "legislature may determine absolutely what shall be done, or it may authorize the same thing to be done upon the consent of third parties. It may command, or it may only permit; and in the latter case, as in the former, its acts have the efficacy of law." *Id.* at 558–59, 16 P. at 301 (internal quotation marks and citation omitted). The role of the judiciary is to respect and carry out the statutes of the General Assembly that prescribe procedures for incorporation and annexation. *See Littleton v. Wagenblast*, 139 Colo. 346, 353, 338 P.2d 1025, 1028 (1959) (holding that the "power of annexation and disconnection is essentially legislative and absent an express statutory

1. Greenwood Village presents the following questions for review:
 1. What is the appropriate standard of review in this case?
 2. Is House Bill No. 99–1099 ("HB 1099") special legislation prohibited by Article V, § 25 of the Colorado Constitution?
 3. Does the application of HB 1099 (giving priority to certain municipal incorporations over pending annexations of a portion of the same territory) to an annexation proceeding commenced prior to the enactment of HB 1099, violate the prohibition against retrospective legislation contained in Article II, § 11 of the Colorado Constitution?
 4. Did the trial court err in holding that the Municipal Annexation Act of 1965, prior to the enactment of HB 1099, gave priority to municipal incorporations of more than 10,000 inhabitants over previously commenced annexations?

2. Centennial presents the following questions for review:

1. Whether the Trial Court erred in finding that, in the absence of and prior to the adoption of House Bill 99–1099, the Centennial incorporation proceedings take priority over the Greenwood annexation proceedings?
2. Standard of Review for House Bill 99–1099:(a) whether, being a political subdivision of the state, Greenwood Village lacks standing to challenge House Bill 99–1099 on constitutional grounds? (b) whether the Trial Court erred in ruling that there is no fundamental right to vote on Greenwood's proposed annexations that is violated by House Bill 99–1099? (c) whether the Court should reconsider the rule that Greenwood has the burden of proving House Bill 99–1099 unconstitutional?
3. Whether the Trial Court erred in finding that, on its face and as applied to the Greenwood annexations, House Bill 99–1099 does not constitute either special legislation or impermissible retrospective legislation?

authorization the court lacked jurisdiction to enter the questioned [annexation] decree").

Accordingly, we have held that: (1) the legislature's power over the setting and changing of municipal boundaries is virtually unlimited, and (2) the legislature may place any requirement or condition thereon, subject only to constitutional restrictions. *See Rogers v. City & County of Denver,* 161 Colo. 72, 74–75, 419 P.2d 648, 649 (1966). In 1980, through the adoption of Article II, section 30, of the Colorado Constitution, the people of the state provided that no unincorporated area may be annexed to a municipality unless: (1) the question has been submitted to the vote of the landowners and the registered electors in the area proposed to be annexed and the majority of such persons voting on the question have voted for the annexation; (2) the annexation petition has been signed by persons comprising more than fifty percent of the landowners in the area and owning more than fifty percent of the area, excluding public streets, alleys, and any land owned by the annexing municipality; or (3) the area is entirely surrounded by or is solely owned by the annexing municipality.[3]

In the case before us, the district court confronted competing petitions for incorporation and annexation of all or part of the same unincorporated area of Arapahoe County. It determined that the Centennial incorporation proceeding had priority over the Greenwood Village annexation proceedings. We now review and construe Colorado's statutes governing priority in the event of such a conflict.

### 2. Priority of Conflicting Proceedings

The statutory provisions for incorporation of unincorporated areas of a county into a new municipality or for annexation of unincorporated areas by an existing municipality have existed side by side since the early days of statehood. *See* 2 Mills Statutes (1891),

§ 4364 (incorporation), § 4375 (annexation); C.R.S.1935, ch. 163, § 2 (incorporation), § 293 (annexation); C.R.S.1953, § 139–1–2 (incorporation), § 139–11–1 (annexation); C.R.S.1963, § 139–1–2 (incorporation), § 139–10–1 (annexation). Prior to 1965, the statutes addressed competing annexation petitions, but did not address a conflict between incorporation and annexation. *See, e.g.,* C.R.S.1963, § 139–10–4 (providing that petitions and counter-petitions for and against a proposed annexation are to be consolidated for vote).

When the legislature adopted the 1965 Act, it added a provision for making a priority determination between competing annexation and incorporation proceedings.[4] *See* Act Providing for Annexation of Territory by a Municipality and Amending Article 10 of Chapter 139, C.R.S.1963, ch. 306, 1965 Colo. Sess. Laws 1186–1209. The 1965 Act provided that an annexation petition filed with a municipality had priority to completion over any subsequent annexation or incorporation petition involving all or part of the same area. *See id.* § 17, at 1203–04; § 31–12–118(2), 9 C.R.S. (1998). In addition, it required that any previously commenced incorporation proceeding must be held in abeyance until final determination of the annexation proceeding. *See* ch. 306, § 17, 1965 Colo. Sess. Laws at 1204; § 31–12–118(3), 9 C.R.S. (1998).

However, the 1965 Act, in section 31–12–118(4), further provided that section 118 shall not apply "to any incorporation petition involving an area which contains more than ten thousand inhabitants." *See* ch. 306, § 17, 1965 Colo. Sess. Laws at 1204; § 31–12–118(4), 9 C.R.S. (1998). The phraseology of this proviso reads: "nor shall this section apply to any incorporation petition involving an area which contains more than ten thousand inhabitants." § 31–12–118(4). This pro-

---

**3.** By its terms, this section of the constitution does not apply to annexations to the City and County of Denver, to the extent that such annexations are governed by other provisions of the constitution. In 1974, an amendment to the Colorado Constitution known as the Poundstone Amendment subjected additional Denver annexations to a vote of the people in the area to be annexed. *See Bennett Bear Creek Farm Water &*

*Sanitation Dist. v. City and County of Denver,* 928 P.2d 1254, 1272 n. 27 (Colo.1996).

**4.** The 1965 Act also contains a provision for resolving the competing annexation claims of two or more municipalities. *See* ch. 306, § 13, 1965 Colo. Sess. Laws at 1198–1200.

vision could alternatively be read as: (1) establishing a priority for incorporations over annexations for an area of over ten thousand inhabitants; or (2) simply as negating the annexation priority otherwise established by section 118.

The district court concluded that, while subsection (4) of section 118 did not specifically set a priority for incorporation of areas over 10,000 inhabitants, the 1965 Act required such a result in this case when read as a whole. The district court relied principally on the statement of legislative purpose to the 1965 Act, which included such objectives as promoting the "natural and well-ordered development of municipalities," distributing "fairly and equitably the costs of municipal services among those persons who benefit therefrom," and reducing "friction among contiguous or neighboring municipalities."[5] It reasoned as follows:

> It seems to the Court that Greenwood Village's proposed annexations require a piecemeal approach to the delivery of services to those who require them. Such annexations, as presented to the Court, would create a greater City of Greenwood Village—a city which surely provides its citizens with considerable, valuable and well organized services. In the final analysis, the establishing of single, homogenous municipal entities satisfies more of the goals of the Municipal Annexation Act of 1965 than does the Greenwood Village approach.

■ In construing the 1965 Act, the district court resorted to statutory construction upon concluding that subsection 118(4), prior to the 1999 Act, did not specifically establish an incorporation priority. Correctly determining that the common law had been displaced by the incorporation and annexation laws, *see Littleton v. Wagenblast*, 139 Colo. at 356, 338 P.2d at 1029–30; *Colorado State*

*Bd. of Pharmacy v. Hallett*, 88 Colo. 331, 336, 296 P. 540, 542 (1931), it then applied the canon of statutory construction that requires courts to construe a statute as a whole, harmonizing potentially conflicting provisions if possible. *See Cooper v. People*, 973 P.2d 1234, 1239 (Colo.1999).

While it determined that Centennial's incorporation proceeding had a priority over the Greenwood Village annexations under pre-existing Colorado law, the district court also found that the 1999 Act, by its plain language, governed the court's further proceedings and the annexation actions of Greenwood Village. *See* §§ 31–12–118, –118.5. Consequently, it undertook to decide the constitutional questions raised by Greenwood Village regarding special and retrospective legislation and impairment of the Highland Park Association pre-annexation agreement.

We agree that the 1999 Act addresses both court and city council proceedings, including the matters of court scheduling, holding the incorporation election, and directing the affected city council not to proceed with its annexation process. The 1999 Act states:

> A governing body shall hold annexation proceedings in abeyance if, on or after the date a petition for annexation pursuant to section 31–12–107(1) or a petition for an election on the question of annexation pursuant to section 31–12–107(2) is filed, a petition for incorporation of the same area or any part thereof is filed pursuant to part 1 of article 2 of this title and such area contains more than seventy-five thousand inhabitants.

§ 31–12–118(2)(b), 9 C.R.S. (1999).

Section 31–12–118.5(2), 9 C.R.S. (1999), further provides that any pending judicial review and city council proceedings are governed by its terms.[6] We therefore conclude

---

5. *See* ch. 306, § 2, 1965 Colo. Sess. Laws at 1186–87.

6. Section 31–12–118.5(2) provides:
 (a) If a petition for an incorporation election is filed pursuant to part 1 of article 2 of this title, then no annexation ordinance that annexes all or any part of the area included in such petition shall be deemed final. This subsection (2)

shall apply only if such area proposed for incorporation contains more than seventy-five thousand inhabitants and such petition is filed:
 (I) Prior to the expiration of the sixty-day limitation on review proceedings contained in section 31–12–116(2)(a); or
 (II) After a review proceeding on such annexation ordinance has been commenced pursuant to section 31–12–116 and prior to the

that the legislature required all courts faced with conflicting incorporation and annexation cases on or after February 1, 1999, the day of its enactment, to apply the 1999 Act to further proceedings. Thus, like the district court, we are not free to determine only that the 1965 Act sets a priority for incorporation over annexation; we must proceed to apply the specific procedures and prohibitions contained in the 1999 Act that the 1965 Act did not spell out. *See Perry v. City of Denver,* 27 Colo. 93, 59 P. 747 (1899)(holding that pending annexations are subject to additional procedures of statutes enacted by the General Assembly after initiation of the pending but as-yet uncompleted annexation).

While the district court's line of reasoning in applying both the 1965 and 1999 Acts is complicated, we find it to be appropriate. The district court could not consult the legislature's 1965 proceedings, because they were not being preserved at that time, but it did have transcripts of the 1999 legislative history before it. This legislative history confirmed for the district court, and for us, that the General Assembly consulted the set of facts involved in this case as an example of an incorporation and annexation conflict and, in so doing, determined to: (1) resolve questions about the meaning of section 118(4), and (2) make its resolution applicable to pending judicial and local government proceedings, including those in this case.

■ While the General Assembly does not often choose this course of action, preferring instead to have statutory changes apply only prospectively, its legislative powers include passing generic legislation that clarifies and resolves pre-existing issues and applies that resolution to pending cases and controversies. *See, e.g., Swieckowski v. City of Fort Collins,* 934 P.2d 1380, 1385 (Colo.1997); *Rickstrew v. People,* 822 P.2d 505, 508 (Colo. 1991); *Colorado Div. of Employment v.*

*Parkview Episcopal Hosp.,* 725 P.2d 787, 792 (Colo.1986). The legislature's choice to proceed in this fashion may lead, of course, to the very kind of special legislation and retrospectivity constitutional challenges we have before us. *See, e.g., Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy Dist.,* 739 F.2d 1472, 1475–76 (10th Cir.1984); *Chatfield East Well Co., Ltd. v. Chatfield East Property Owners Ass'n,* 956 P.2d 1260, 1272–73 (Colo. 1998).

Thus, we now proceed to Greenwood Village's standing to challenge the constitutionality of the 1999 Act. We hold that Greenwood Village has standing to challenge the 1999 Act as special and retrospective legislation, and as an unconstitutional impairment of contract. Greenwood Village cannot, however, invoke the voting rights of third parties in challenging the constitutionality of the 1999 Act.

### B. Standing

■ Centennial argues that Greenwood Village lacks standing to challenge the constitutionality of the 1999 Amendment. Standing is a justiciability doctrine that tests a litigant's right to raise legal arguments or claims. *See Romer v. Board of County Comm'rs,* 956 P.2d 566, 572 (Colo.1998). Because standing is a threshold jurisdictional question, we must address it first, before conducting the constitutional review Greenwood Village seeks. *See Denver Urban Renewal Auth. v. Byrne,* 618 P.2d 1374, 1379 (Colo.1980).

■ Colorado's standing requirement, like that employed in the federal courts, embraces both constitutional and prudential concerns.[7] *See Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 538–39 (1977). The constitutional prong of our standing ju-

date of a judicial declaration or final judgment, including an appellate judgment, on such review proceeding.
(b) If such incorporation election is approved by a court order entered pursuant to section 31–12–103, then such annexation ordinance shall be deemed void with respect to any area that is incorporated pursuant to such election.

7. Because Colorado standing doctrine is rooted in our own constitution and rules of judicial self-governance, Colorado standing jurisprudence does not duplicate all the features of federal standing doctrine. However, similar considerations underlie both Colorado and federal standing law, and we frequently consult federal cases for persuasive authority. · *See Maurer v. Young Life,* 779 P.2d 1317, 1324 n. 10 (Colo.1989).

risprudence is rooted in Article VI, section 1 of the Colorado Constitution, under which we limit our inquiry to the resolution of actual controversies. *See Maurer v. Young Life,* 779 P.2d 1317, 1323 (Colo.1989) (citing *Colorado General Assembly v. Lamm,* 700 P.2d 508, 516 (Colo.1985)). The prudential prong reflects considerations of judicial self-restraint. *See id.* at 1324.

### 1. Constitutional Prong

 Under the constitutional prong of our standing test, a plaintiff must demonstrate that he or she will suffer an "injury in fact" from the challenged action.[8] Injuries need not be economic in character; harm to intangible values can satisfy the injury-in-fact requirement. *See Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (aesthetic and ecological interests); *Colorado General Assembly v. Lamm,* 704 P.2d 1371, 1378 (Colo.1985) (legislature's authority to appropriate funds); *Conrad v. City & County of Denver,* 656 P.2d 662, 668 (Colo.1983) (governmental interference with religion). In addition to providing the actual controversy required for courts to constitutionally exercise their power under Article VI of Colorado's constitution, the injury-in-fact requirement ensures a "concrete adverseness which sharpens the presentation of issues" that parties argue to the courts. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see also People v. Rosburg,* 805 P.2d 432, 435 (Colo.1991).

 Greenwood Village's interest in expanding its population and tax base in the provision of local services, including sharing the cost of its investments in infrastructure, is substantial and would be adversely affected if we uphold the 1999 statute and the voters approve the proposed City of Centennial. *See City of Colorado Springs v. State,* 626 P.2d 1122, 1127 (Colo.1981) (holding that injury to city's interests in budgeting and taxation constituted injury in fact); *Byrne,* 618 P.2d at 1380 (holding that impact on city's general fund from bond issuance con-

stituted injury in fact). Consequently, we hold that Greenwood has demonstrated sufficient "injury in fact" for constitutional standing purposes.

### 2. Prudential Prong

 The prudential prong of our standing test requires the plaintiff to demonstrate that the injury he or she has suffered is to a legally protected right. *See Maurer,* 779 P.2d at 1323–24. Prudential considerations are "judicially self-imposed limits on the exercise of a court's jurisdiction." *Id.* at 1324 (internal quotes and citation omitted). They recognize that unnecessary or premature decisions of constitutional questions should be avoided, and that parties actually protected by a statute or constitutional provision are generally best situated to vindicate their own rights. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 955, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). "[P]rudential limitations add to the constitutional minima a healthy concern that if the claim is brought by someone other than one at whom the constitutional [or statutory] protection is aimed, the claim not be an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Id.* at 955 n. 5.

Two prudential standing limits are especially relevant in this case. The first is a specific doctrine that limits a political subdivision's ability to challenge the constitutionality of state statutes directing the performance of its duties. The second is a doctrine of general applicability that bars third parties from raising the rights of those not party to a suit.

#### a. Political Subdivision Standing

 The rule barring political subdivisions of the state from challenging state statutes directing the performance of their duties exists "so that courts do not unnecessarily intrude into matters which are more properly committed to resolution in another branch of government." *Romer v. Board of County*

---

8. Federal courts have further refined the injury in fact test to require an injury that is both "concrete and particularized," on the one hand and "actual or imminent, not conjectural or hypothetical" on the other. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Our standing doctrine does not require these refinements.

*Comm'rs*, 956 P.2d at 573. It is based on a belief that "political subdivisions of the state exist only for the convenient administration of the state government," and are "created to carry out the will of the state." *Byrne*, 618 P.2d at 1380.

 This rule and its siblings are often identified with our decision in *Martin v. District Court*, 191 Colo. 107, 550 P.2d 864 (1976). In *Martin*, this court established a rule precluding standing when: (1) the agency seeking judicial review is subordinate to the agency whose decision is sought to be reviewed, and (2) no statutory or constitutional provision confers a right on the subordinate agency to seek judicial review of the superior agency's decision. *See id.* at 109, 550 P.2d at 866; *see also Maurer*, 779 P.2d at 1320. We have held that the rule not only prevents local governments from challenging state statutes directing the performance of their duties, *see, e.g., Romer v. Fountain Sanitation Dist.*, 898 P.2d 37, 40 (Colo.1995); *Board of County Comm'rs v. General Assembly*, 198 Colo. 302, 599 P.2d 887, 888 (1979), but prevents subordinate state agencies from challenging the actions of superior state agencies as well, *see, e.g., Romer v. Board of County Comm'rs*, 956 P.2d at 574; *Martin*, 550 P.2d at 865.[9]

 Nevertheless, we have recognized an exception to the rule when a state statute impacts a home-rule city's interests in the administration of local affairs. We first established this exception in *Byrne*, 618 P.2d at 1380–81. There, Denver alleged that a statute establishing a financing plan for special districts interfered with matters of local concern such as Denver's collection of ad valorem taxes. We held that "a home rule city is not inferior to the General Assembly concerning its local and municipal affairs," and that "[t]he Colorado Constitution confers upon a home rule city a legally protected interest in its local concerns." *Byrne*, 618 P.2d at 1381. Consequently, Denver had standing.

Shortly thereafter, we applied *Byrne* in *City of Colorado Springs v. State*, 626 P.2d at 1126–27. In *Colorado Springs*, we held that the home-rule city of Colorado Springs had standing to challenge a state statute regulating firemen's pension funds. Although the firemen's pension statute addressed a matter of statewide concern, we recognized that it impacted "city budgeting and the assessment and collection of taxes for municipal purposes." *Id.* at 1127. Because the statute had "obvious implications for the moneys which can be budgeted for purely local and municipal purposes," we upheld the city's standing. *Id.*

 We hold that the exception recognized in *Byrne* and *Colorado Springs* applies in this case. Here, as in *Colorado Springs*, the legislature has acted on a matter that is clearly one of statewide concern—annexation. *See Fort Collins–Loveland Water Dist.*, 174 Colo. at 82, 482 P.2d at 988. Yet the effects of the 1999 Act—if we uphold it and the citizens vote to establish the City of Centennial—will be to impact Greenwood's municipal interests in tax collection, budgeting, and expansion of its infrastructure base. Home rule cities are not the sole creatures of the General Assembly that other municipalities are. They are created pursuant to constitutional authority. *See* Colo. Const. art. XX, § 6. A home-rule government's interest in its own viability, *see Winslow Construction Company v. City & County of Denver*, 960 P.2d 685, 692 (Colo.1998), is sufficiently different from that of legislatively-created local governments to permit its standing to challenge an act of the General Assembly that affects annexation proceedings it has initiated. Thus, we conclude that Greenwood Village has a legally protected interest and has alleged injury-in-fact sufficient to maintain standing on its special legislation, retrospectivity, and impairment of contract arguments.

b. Third–Party Standing

 Greenwood Village also challenges the 1999 statute on grounds that it impairs

---

9. We have given effect to statutes that confer standing on political subdivisions. *See Board of County Comm'rs of the County of Jefferson v. City & County of Denver*, 194 Colo. 252, 255, 571 P.2d 1094, 1096 (1977).

the voting rights of others. It contends that the 1999 Act will prevent landowners and residents of the Greenwood annexation parcels from voting on the question of annexation. The landowners and residents whose rights Greenwood Village seeks to vindicate by its voting rights argument are not parties to this appeal. We hold that Greenwood Village cannot raise these arguments on their behalf.

■■■■■ The third-party standing rule prevents a party from asserting the claims of third parties who are not involved in the lawsuit. Thus, "[a] party raising a constitutional challenge to a statute must demonstrate not only that the alleged unconstitutional feature of the statute injures him but also that he is within the class of persons with respect to whom the act is unconstitutional." *Miller v. Albright*, 523 U.S. 420, 446, 118 S.Ct. 1428, 140 L.Ed.2d 575 (1998) (O'Connor and Kennedy, JJ., concurring) (citations omitted). The U.S. Supreme Court has explained the justification for this rule as follows:

> First, the courts should not adjudicate [constitutional] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them. The holders of the rights may have a like preference, to the extent they will be bound by the courts' decisions under the doctrine of Stare decisis.

*Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (citations omitted).

■■■ We recognize exceptions to this rule when the party before the court can establish one of three circumstances: (1) the existence of a substantial relationship between the party before the court and the third party; (2) the difficulty or improbability of the third party in asserting an alleged deprivation of his or her rights; or (3) the need to avoid dilution of third-party rights in the event that standing is not permitted. *See Rosburg*, 805 P.2d at 435.

None of these exceptions applies to this case. First, Greenwood Village cannot be said to enjoy a substantial relationship with the unincorporated area voters whose rights it claims the 1999 Act impairs. Even if a local government could be said to enjoy a substantial relationship with its citizens—a question we need not decide—here, Greenwood Village stands in no such position with the residents of the annexation parcels who are not within its current boundaries. Second, we see no recognizable barrier to participation by voters in these proceedings.

Third, the case before us does not present an instance of dilution of third party rights sufficient to allow Greenwood Village standing to seek their vindication. This third exception to the third party standing rule is narrow. It first made its way into our cases in *Augustin v. Barnes*, 626 P.2d 625, 628 (Colo.1981), but we have not delineated the circumstances in which it actually applies. In *Augustin* we drew on *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), which allowed a vendor of alcohol to raise an equal protection challenge to a law outlawing the sale of 3.2 beer to men under the age of twenty-one but allowing sales to women over the age of eighteen. In *Craig*, the U.S. Supreme Court was concerned that the class of men affected by the ordinance—those in a three-year age span—might not be able to vindicate its own interest because the individual plaintiffs would likely be out of the age group before the matter was finally determined. *See id.* at 194, 97 S.Ct. 451.

Thus, we understand our concern in *Augustin*, as the basis for the third exception to the third-party standing rule, to be one based on "rolling mootness" or a concept of comparable special dimension. It deals with unique circumstances that prevent a third party from actually vindicating his or her own rights. It would swallow the third-party standing rule were we to turn this third exception into a free-standing proviso based on the assertion that the important rights of others may be at stake. Our operative as-

sumption is that these "others" will come before us if they have a sufficient interest at stake and their participation is vital to the resolution of the controversy that impacts that interest. No special circumstance exists here to justify Greenwood Village's standing to raise the voting rights of others.

We now proceed to discuss the standard of review that guides our analysis of the constitutional issues which Greenwood Village has standing to raise.

### C. Standard of Review

■■■■ Because application of a constitutional standard is a question of law, we review the trial court's rulings on these issues de novo. *See General Motors Corp. v. City & County of Denver,* 990 P.2d 59, 67 (Colo. 1999). This case involves the presumption of constitutionality we accord to statutes. *See Submission of Interrogatories on House Bill 99–1325,* 979 P.2d 549, 554 (Colo.1999). Ordinarily, unless the party challenging a statute persuades the court that the statute violates the constitution, the statute will stand as enacted.[10]

The presumption of constitutionality is rooted in the doctrine of separation of powers; thereby, the judiciary respects the roles of the legislature and the executive in the enactment of laws. This presumption reflects the foundational premise that these co-equal branches observe and effectuate constitutional provisions in exercising their power. *See Meyer v. Lamm,* 846 P.2d 862, 876 (Colo. 1993); *see also Rust v. Sullivan,* 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (following canon that Supreme Court assumes Congress legislates in light of constitutional limitations).

■■■■ At its core, the presumption of a statute's constitutionality reflects the sound principle that courts "do not lightly declare a statute unconstitutional," *Higgs v. Western Landscaping & Sprinkler Sys., Inc.,* 804 P.2d 161, 165 (Colo.1991), and acknowledges

that declaring a statute unconstitutional is one of the gravest duties impressed upon the courts. "To declare an act of the legislature unconstitutional is always a delicate duty, and one which courts do not feel authorized to perform, unless the conflict between the law and the constitution is clear and unmistakable." *People v. Goddard,* 8 Colo. 432, 437, 7 P. 301, 304 (1885).

■■■ Consequently, parties challenging statutes on constitutional grounds ordinarily must prove the statute's unconstitutionality "beyond a reasonable doubt." *See, e.g., People v. Hickman,* 988 P.2d 628, 634 (Colo. 1999); *Board of Educ. v. Booth,* 984 P.2d 639, 650 (Colo.1999). The type of constitutional challenge, the nature of the challenged statute, and the standing of the parties determine how we approach judicial review in a particular case, such as the one before us.

We now proceed to examine the contentions of Greenwood Village that the 1999 Act is unconstitutional special and retrospective legislation and unconstitutionally impairs the Highland Park pre-annexation agreement. We accord this statute a presumption of constitutionality. In order for Greenwood Village to prevail, it must demonstrate beyond a reasonable doubt that the 1999 Act is constitutionally defective.[11]

### D. Special Legislation

Article V, section 25, of our state constitution provides, in relevant part:

> The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say ... the opening or conducting of any election....
> In all other cases, where a general law can be made applicable no special law shall be enacted.

Colo. Const. art. V, § 25.

■■■■ This provision tests whether legislation is "general and uniform in its opera-

---

10. The exception is when a statute implicates a suspect classification or impacts a fundamental right, which shifts the burden for sustaining the statute's constitutionality to the government. *See Denver Pub. Co. v. City of Aurora,* 896 P.2d 306, 319 (Colo.1995).

11. Greenwood Village asks that we revisit our beyond a reasonable doubt standard, asserting that it wrongly involves an evidentiary burden. The burden is one of persuasion, and we perceive no need to reformulate the standard.

tion upon all in like situation." *American Water Dev., Inc. v. City of Alamosa*, 874 P.2d 352, 370 (Colo.1994) (hereinafter *AWDI* ) (quoting *Curtiss v. GSX Corp. of Colorado*, 774 P.2d 873, 876 (Colo.1989)). Our inquiry under Article V, section 25 thus focuses on whether legislation creates valid classifications, and, if so, whether the classifications are reasonable and rationally related to a legitimate public purpose. *See In re Interrogatory on House Bill 91S–1005*, 814 P.2d 875, 885 (Colo.1991). In this sense, Article V, section 25 resembles Equal Protection doctrine. "The prohibition against special legislation, however, is more than a redundant Equal Protection Clause," because in cases of enumerated prohibitions it involves a "threshold question [of] whether the classification adopted by the legislature is a real or potential class, or whether it is logically and factually limited to a class of one and thus illusory." *Id.* at 886.

 Thus, in cases where an enumerated prohibition—such as the prohibition on laws affecting elections that both parties concede is applicable here—applies, the class created by legislation cannot be limited to one. *See id.* at 885. Nonetheless, so long as the class created does not implicate a fundamental right or a suspect class,[12] we review even laws governed by an enumerated prohibition of Article V, section 25 under a rational basis standard of review. *See id.* at 885–86.

 Application of the rational basis test under an enumerated prohibition of Article V, section 25 requires us to determine whether a classification: (1) is genuine rather than illusory, and (2) is reasonably related to a legitimate governmental purpose. *See id.* at 887; *Poudre Valley Rural Elec. Ass'n, Inc. v. City of Loveland*, 807 P.2d 547, 553 (Colo. 1991).

 Greenwood Village claims that both the legislative history of the 1999 Act and the reality of Colorado's demographics make clear that the act is special legislation. We agree that the legislative history undeniably demonstrates that the legislature's objectives in passing the 1999 Act included establishing rules that govern the case before us. Much of the legislative debate focused on the problem presented by the Centennial versus Greenwood Village conflict. Legislators referred to the bill as "the Centennial Bill" prior to its passage, and the Colorado Senate delayed voting on the bill in an effort to allow the parties to resolve this dispute through mediation. Certainly, as the district court observed, the efforts of Centennial organizers to have their incorporation vote first was the catalyst for the bill's introduction and adoption.

Nonetheless, the legislative history of the 1999 Act reveals that the General Assembly focused also on the generic problems raised by the Centennial example and the lack of specificity in the pre-existing section 31–12–118(4), which negates the otherwise applicable priority for annexation over incorporation, but does not specifically enunciate a priority for the conflicting incorporation proceeding. It heard testimony from witnesses unrelated to the Centennial dispute who discussed the population growth occurring in other unincorporated areas of the state and how legislative resolution of the problem would impact present and foreseeable situations.

Hearings before the House Local Government Committee revealed that the bill would affect areas in Jefferson, El Paso, and Douglas Counties. Larry Kallenberger of Colorado Counties, Inc., testified that counties were not set up or equipped to provide urban services in unincorporated areas experiencing large population growth:

> We (the counties) don't have the power to provide water and sewer or a number of the other services under state law so I believe this is a sound alternative to what we might face otherwise which would be urban powers for counties. I think that most county governments want to stay county governments and want to deal with unincorporated areas but this large mass-

12. Greenwood Village alleges that the 1999 Act impacts the fundamental right to vote, and that it must therefore be subject to strict scrutiny rather than rational basis review. However, Greenwood Village lacks standing to raise the voting rights issue. Consequently, rational basis review applies.

ing of sort of influx of civilization within unincorporated areas does leave us with the dilemma of how do we serve them as county governments throughout Colorado.

Transcript of House Local Government Committee Hearing on HB 1099, Jan. 11, 1999, at 44. Other witnesses included David Broadwell of the Colorado Municipal League, who testified to the bill's applicability other than to the Centennial/Greenwood Village dispute. After stating that "the basic direction of the bill ... is contrary to standing positions the League has had for a long time," he said:

Let me just say one thing, Mr. Chairman. I have kind of broken out some of the numbers to figure out where else this might apply. I came up with about 200,-000 unincorporated in Jeffco, about 80,000 unincorporated in Douglas County right now, and we know that growth trends in those two counties, so those are just baseline numbers. I do indeed see situations where future annexations to Lakewood, to Littleton in particular, maybe to Parker in the future, future annexations could also be affected by this in some of the ways that you've heard here earlier.

Id. at 102.

Floor debate before the full House also addressed the question of whether the 1999 Act applied only to the Centennial/Greenwood Village case. A colloquy between Representative Hagedorn and Representative Sullivant, the bill's sponsor, is illustrative:

REP. HAGEDORN: [M]y question, my concern here again is that are we specifically targeting the Centennial issue and using that number, and could that qualify as special interest, not legislation?

MR. SPEAKER: Representative Sullivant to respond.

REP. SULLIVANT: The 75,000 number came about for a couple of reasons. The City of—the proposed City of Centennial is actually 110,000 people. But there are other cities that are growing very quickly that will reach that number, we believe, within the next year or so. Highlands Ranch is a good example of that, and there are some others. So, I don't know if that's the magic number. Perhaps it should have been 69,000 or 71,500. But it's just a

number that we picked. I can't tell you that it was magical, nor founded on anything in particular, rather that it seemed like a good number to start with.

Transcript of Proceedings before the House of Representatives held Jan. 12, 1999 regarding HB 1099, at 15–16. Similar testimony and debate occurred in the Senate Local Government Committee and before the Senate as a whole.

Thus, while the Centennial/Greenwood dispute clearly affected the timing and enactment of the 1999 Act, we do not agree with Greenwood Village that the bill deals only with the adjustment of municipal boundaries as between it and Centennial. The 1999 Act is generic in its application, is applicable to other foreseeable situations, does not deal with a class of one, and thus passes constitutional muster under Article V, section 25. See AWDI, 874 P.2d at 370–71; In re Interrogatory on House Bill 91S–1005, 814 P.2d at 885–88; Darrow v. People, 8 Colo. 417, 418–19, 8 P. 661, 662 (1885).

We first established these principles of special legislation review in Darrow. There, we upheld the constitutionality of legislation that created a superior court in any town or city having more than 25,000 inhabitants, even though Denver was the only city of that size when the legislation was adopted:

Denver, it is true, is the only city to which the act at present applies. But the legislature clearly intended to provide for places that may hereafter acquire the population mentioned. The law is general, and is unlimited as to time in its operation. There is nothing unreasonable in the supposition that other towns and cities within the state will eventually contain twenty-five thousand inhabitants. Whenever this size is attained by such municipal corporations, the act becomes applicable thereto.

Darrow, 8 Colo. at 418–19, 8 P. at 662.

Revisiting Darrow a century later, we decided In re Interrogatory on House Bill 91S–1005, 814 P.2d 875. There, the Governor convened a special session of the General Assembly to consider legislation conducive to location of a large United Air Lines facility in Colorado. The Governor's call for the ses-

sion heralded as the reason therefore that " 'a unique economic development opportunity has been presented which requires immediate action.' " *In re Interrogatory on House Bill 91S–1005*, 814 P.2d at 881 (quoting Proclamation Call for the First Extraordinary Session of the Fifty–Eighth General Assembly).

In reviewing the act produced from that special session, we took judicial notice that "the primary purpose of the governor's call for the special session was to enable the General Assembly to consider legislation authorizing 'incentives' to encourage United Airlines to construct and operate a new maintenance facility in Colorado." *Id.* Nonetheless, although the class of companies able to take advantage of the bill was "necessarily small by virtue of the limited resources of the state," we concluded that the class created by the legislation was "not so logically and factually restricted that it amount[ed] to an illusory class of one." *Id.* at 887.

Several years later, we again revisited *Darrow* in *AWDI*, 874 P.2d at 371. There, we noted that "the legislature was apparently aware of just two geographic regions that would be affected" by legislation stating that stream systems both arising as natural surface streams and terminating in Colorado are natural stream systems subject to appropriation. We held that Article V, section 25 did not prohibit this legislation:

Like the legislation at issue in *Darrow*, the natural surface stream legislation has an indefinite period of application. Analogous to *Darrow*, there is nothing unreasonable in the supposition that with the development and refinement of knowledge of the geography and hydrology of the state, it may be learned that there are other stream systems that arise as natural surface streams and terminate in Colorado. Therefore, in the future, this legislation may be found to apply to such other streams.

*AWDI*, 874 P.2d at 371.

Greenwood Village argues that the case before us is more analogous to *In re Senate Bill No. 95*, 146 Colo. 233, 361 P.2d 350 (1961), than it is to *Darrow* and its progeny. In that case, we held that a bill allowing Denver to annex the city of Glendale constituted special legislation. We said:

As judges we may not close our eyes to facts which as men we conclusively know to be true, which we would have to do if we pretended to be unaware of the fact that this legislation was known to every member of the legislature and to every other interested person as "The Glendale Bill." We would be blind to stark reality indeed if we assumed the possibility of any other geographical areas in Colorado to which it would apply save and except the city of Denver and the town of Glendale.

*Id.* at 238, 361 P.2d at 353. The specter of Glendale is not the reality of Centennial. The statute before us in that case applied solely to Glendale and was preceded by unsuccessful efforts Denver had made to annex that area. Glendale had twice refused by election to be annexed to Denver. Senate Bill No. 95, adopted at the 1961 Session of the Colorado General Assembly, would have dissolved any town of less than 640 acres surrounded by a city or city and county for five years or more, making that town a part of the surrounding municipal entity. Thus, we concluded that the enactment was directed to a class of one:

Senate Bill No. 95 was unquestionably conceived, cut, tailored and amended to accomplish a particular purpose with reference to a particular area, to-wit, Glendale. Once having accomplished that particular purpose the act would die before it could possibly accomplish a like purpose in any other place.

*Id.* at 354.

We have previously distinguished those circumstances from others. "The Glendale Bill was written and amended so that it applied only to Glendale, since there was no other city of less than 640 Acres that was completely surrounded by a city or town." *In re Interrogatory on House Bill 91S–1005*, 814 P.2d at 887. "Moreover, a repealing clause contained in the legislation provided for its automatic repeal the following year, so that there was no possibility of any other geographical areas in Colorado to which it would apply." *Id.*

Greenwood Village has not demonstrated that the 1999 Act is special legislation. It is not impermissibly singular in its application. It is reasonably related to a legitimate governmental purpose: uniform statewide management of urban growth and municipal boundaries. *See Rogers v. Denver,* 161 Colo. at 74, 419 P.2d at 649. Its purposes include allowing citizens in large unincorporated areas to choose their community—whether to create a new municipal community or become part of an existing municipality.

The desire to create a new home, distinct from others, has deep Colorado roots. Annexation can create "orphan communities," those that are not annexed because the tax base or cost of service or other consideration of the annexing municipality renders them undesirable. The General Assembly has determined that citizens in an area of sufficient density and population capable of becoming a viable city should have an opportunity and specified priority to vote for or against incorporation, before annexation can preclude that choice.

Should the voters not approve incorporation of Centennial, the 1999 Act provides that the Greenwood annexation votes may proceed. The legislation affords this opportunity to citizens of unincorporated areas in similar circumstances. We respect the General Assembly's choice. We determine that the 1999 Act does not contravene Article V, section 25 of the Colorado Constitution.

### E. Retrospectivity

We now turn to Greenwood Village's claim that the 1999 Act is unconstitutional retrospective legislation. It contends that the 1999 Act "retrospectively repeals an adopted municipal ordinance annexing the Greenwood South East property subject only to the holding of elections, effectively nullifies previously filed annexation petitions, changes retroactively the rights of the respective parties and cancels previously scheduled elections depriving thousands of electors of the right to vote."

Article II, section 11, of the Colorado Constitution provides:

No ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly.

Our two-step process for reviewing a law under the retrospectivity portion of this constitutional provision requires us to determine whether the General Assembly intended the challenged statute to be retroactive and, if so, whether the statute is unconstitutionally retrospective. *See Ficarra v. Department of Regulatory Agencies,* 849 P.2d 6, 12 (Colo. 1993).

A statute is retroactive when it "operates on transactions that have already occurred or rights and obligations that existed before its effective date." *Id.* at 11. Although the retroactive application of a statute is generally disfavored by the common law, and by statute, the retroactive application of a civil statute is not necessarily unconstitutional. "Otherwise stated, under our state constitution, some retroactively applied civil legislation is constitutional, and some is not, and it is helpful to mark this distinction by using the term *retrospective* to apply only to legislation whose retroactive effect violates the constitutional prohibition." *Id.* at 12 (emphasis in original).

All parties concede that the General Assembly intended the 1999 Act to have retroactive effect, and we agree. Accordingly, we proceed to the second step of our analysis. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 226, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly.") A statute operates retrospectively if it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability with respect to transactions or considerations already past. *See Ficarra,* 849 P.2d at 15; *see also Shell Western E & P, Inc. v. Dolores County Bd. of Comm'rs,* 948 P.2d 1002, 1011 (Colo.1997).

"A right is only vested when it is not dependent upon the common law or the statute under which it was acquired for its assertion, but has an independent existence." *People v. D.K.B.*, 843 P.2d 1326, 1331 (Colo. 1993). The enactment of a statute that alters the litigation posture of the parties to a pending lawsuit in regard to inchoate rights is not retrospective. *See Chatfield*, 956 P.2d at 1273 (citing *Animas–La Plata*, 739 F.2d at 1477). Retroactive application of a statute is not rendered unlawful merely because the facts upon which it operates occurred before adoption of the statute. *See D.K.B.*, 843 P.2d at 1332; *Continental Title Co. v. District Court*, 645 P.2d 1310, 1314 (Colo.1982).

Here, Greenwood Village stakes its retrospectivity challenge on its asserted right to follow through with annexation proceedings it commenced prior to the filing of Centennial's incorporation petition. It asserts a vested right to proceed with the annexation process through completion based on: (1) an asserted "common law rule of primary jurisdiction" in favor of an annexation proceeding, and (2) the district court's entry of an order on December 18, 1998, prior to enactment of the 1999 Act, for the appointment of election commissioners and the holding of the South East annexation election.

Greenwood Village's retrospectivity challenge parallels a challenge presented to us in *Perry v. Denver*, 27 Colo. 93, 59 P. 747 (1899), a case that we find controlling here. In *Perry*, electors and taxpayers of the Town of Fletcher (Fletcher) commenced proceedings to dissolve their town and annex its territory to the City of Denver. *See Perry*, 27 Colo. at 94, 59 P. at 747. Like the annexation proceedings in this case, the proceedings in *Perry* were governed by statute. *See id.; see also* § 4389, 3 Mills' Ann. Stats. (1897). Pursuant to the existing applicable statutes, Fletcher petitioned the county court and obtained an order requiring the proper authorities to submit the question of the dissolution and annexation of the town to its qualified voters. *See Perry*, 27 Colo. at 94, 59 P. at 747; § 4389(i). Under those statutes in place at the time of the county court's order, Fletcher's dissolution and annexation would have been complete upon approval by its electors and the filing of a court order affirming the election results in the county recorder's office. *See* § 4389(g), (p).

Two days after the county court entered its order, the General Assembly amended Colorado's annexation statutes. *See Perry*, 27 Colo. at 94, 59 P. at 747; ch. 75, sec. 1, 1897 Colo. Sess. Laws 272, 272–73. The amendments effectively prohibited Fletcher from completing its dissolution and annexation proceedings unless the City of Denver first passed an ordinance consenting to the annexation. *See Perry*, 27 Colo. at 94, 59 P. at 747; ch. 75, sec. 1, 1897 Colo. Sess. Laws. at 272–73.

Like Greenwood Village in this case, Fletcher argued that the amendments were a retrospective law prohibited by Article II, section 11 of the Colorado Constitution. *See Perry*, 27 Colo. at 95, 59 P. at 747. We disagreed, holding:

The right granted contiguous towns and cities to unite upon compliance with the conditions specified in the act on the subject, was a mere privilege which might be exercised, by the towns and cities to which it was extended; but until that privilege was accepted by at least a completion of the steps necessary to observe to effect annexation, it was within the control of the legislature to direct what requirements were necessary to effect that result, which did not impair the proceedings already had. That the original petitioners had taken certain preliminary steps having for their object the annexation of the town of Fletcher to the city of Denver, gave them no vested right to have such proceedings conducted to final determination under the law as it then existed, because a right cannot be considered vested unless it be something more than such a mere expectation as may be based on an anticipated continuance of a present given law.

*Perry*, 27 Colo. at 96, 59 P. at 748–49.

The facts presented in *Perry* mirror the facts of this case. In both cases, a municipality commenced annexation proceedings pursuant to then-existing statutory law and obtained a court order requiring the appropriate authorities to submit the question of annexation to a vote. In both cases, the

General Assembly passed legislation that amended the statutes governing annexation prior to completion of the annexation process, imposing in both cases an additional and potentially insurmountable hurdle in the path of those seeking to continue the annexation proceedings through to completion.

■ The reasoning in *Perry* is as sound today as it was a century ago. Moreover, contemporary precedent also demonstrates that expectations of parties to litigation are not equivalent to vested rights. In 1984, as in both *Perry* and the case before us, the General Assembly "quickly considered and passed" House Bill 1272 that "validated" and "recreated" every then-existing water conservancy district in the state. *See Animas–La Plata*, 739 F.2d at 1475. The statute in question was enacted in response to litigation contesting the legality of the Animas–La Plata Water Conservancy District, which had been organized under the statute's pre-existing petition and judicial proceeding process. Reviewing Colorado law, the United States Court of Appeals for the Tenth Circuit rejected the litigants' retrospectivity challenge. Although the plaintiffs in that case argued "that the motive behind House Bill 1272 was to destroy their pending lawsuit," *id.*, the court observed that: (1) plaintiffs' "rights in challenging the district were inchoate," *id.* at 1477, and (2) the Assembly's action "was designed to promote what the legislature deemed a 'public purpose' in response to a troublesome situation." *Id.* at 1478. Such is the case here as well.

Accordingly, we find *Perry* to be dispositive and the case before us not a close one in light thereof. Greenwood Village had no vested right to complete its annexation under the law as it existed prior to the 1999 Act. *See Perry*, 27 Colo. at 96, 59 P. at 748–49. The only right that Greenwood Village could assert was that the steps already taken toward annexation not be impaired. *See id.* The 1999 Act did not have the effect here of annulling the district court's order directing submission of the annexation question to the voters. Rather, it held the annexation proceeding in abeyance and advanced the incorporation proceeding to first priority, and, in so doing, did not violate Article II, section 11 of the Colorado Constitution. *See id.*

### F. Impairment of Contract

■ Nor did the 1999 Act impair a vested contract right to hold an annexation election under the Highland Park pre-annexation agreement. Like the retrospectivity provision, Colorado's constitutional guarantee against the impairment of contracts appears in Article II, section 11 of the Colorado Constitution. It provides that: "No ... law impairing the obligation of contracts ... shall be passed by the general assembly." Colo. Const. art. II, § 11.

■ Pre-annexation agreements shape the respective rights and responsibilities of the parties thereto in connection with a consensual annexation, but they carry no assurance that the particular annexation complies with Colorado law. Annexation is a special statutory proceeding. *See Town of Superior v. Midcities Co.*, 933 P.2d 596, 602–604 (1997). Compliance with the statutory procedures for accomplishing the annexation is an unavoidable qualification to a pre-annexation agreement actually ripening into an annexation. Although it might allow a party to withdraw from its annexation commitment if the agreement is breached, *see Midcities*, 933 P.2d at 603, such an agreement does not operate to divest the General Assembly of its powers to enact amendments to incorporation and annexation laws. Courts must implement those laws when adjudicating rights and duties and fashioning remedies in a contested case. *See Perry*, 27 Colo. at 94, 59 P. at 747.

The parties to the Highland Park agreement provided that an annexation election would occur and also specified the date thereof: "Greenwood Village agrees that an election on the annexation of the Project into Greenwood Village shall be held pursuant to the provisions of C.R.S. 31–12–107(2) and 31–12–112 on February 16, 1999, and that an election shall be held on March 9, 1999, within the boundaries of Greenwood Village pursuant to section 1.08 of the City Charter." Greenwood Village contends that this is a "contract right" which the 1999 Act unconstitutionally impairs. We disagree. Holding

the contemplated election, and obtaining a court order for annexation based thereon, were plainly subject under our *Perry* decision to the General Assembly's power to enact further procedures governing the pending annexation. Here, the General Assembly specified the additional procedure of holding in abeyance a pending annexation, thereby frustrating the parties' earnest but unenforceable promise to each other to proceed to completion with the Greenwood Village annexation despite Centennial's incorporation petition.

### III.

Greenwood Village's well-argued case is one of disappointed expectations and assignation of ill motives to the General Assembly and the Centennial organizers. Nonetheless, we have been among those who suggested to the General Assembly that the 1965 Act was "inartfully drafted," has resulted "in substantial controversies," and merits an effort to "eliminate and resolve apparent inconsistencies." *Board of County Comm'rs of the County of Jefferson v. City & County of Denver*, 194 Colo. 252, 258, 571 P.2d 1094, 1098 (1977). The legislature has acted within its power to address through the 1999 Act the inartfully drawn priority of proceedings section of the annexation statute, section 31–12–118(4), in an attempt to resolve present and future controversies. It has provided that citizens of large unincorporated areas of counties should be able to vote for incorporation over a pending annexation if they choose. As this is within the General Assembly's power to prescribe, we hold that the 1999 Act does not violate the special legislation, retrospectivity, or impairment of contracts provisions of the Colorado Constitution, despite the disappointment of an adjoining city that prefers annexation.

Accordingly, we affirm the judgment of the district court, except that we reverse the court's order in regard to the Highland Park pre-annexation agreement. The Centennial incorporation election shall proceed. We remand this case to the district court for further proceedings consistent with this opinion.