PETRON DEVELOPMENT COMPANY,
Petitioner–Appellant,

and

Mary E. Huddleston, Property Tax Administrator for the State of Colorado, Intervenor–Appellant,

v.

WASHINGTON COUNTY BOARD OF EQUALIZATION, Respondent–Appellee,

and

Colorado State Board of Assessment Appeals, Appellee.

No. 02CA1476.

Colorado Court of Appeals,
Div. V.

Oct. 9, 2003.

Certiorari Granted June 7, 2004.

Holland & Hart, LLP, Alan Poe, Marcy G. Glenn, Greenwood Village, Colorado, for Petitioner–Appellant.

Ken Salazar, Attorney General, Larry A. Williams, Assistant Attorney General, Denver, Colorado, for Intervenor–Appellant.

Berg Hill Greenleaf & Ruscitti, LLP, Josh A. Marks, Boulder, Colorado; Hall & Evans LLC, Edmund M. Kennedy, Denver, Colorado, for Respondent–Appellee.

Ken Salazar, Attorney General, John Baird, Assistant Attorney General, Denver, Colorado, for Appellee.

Holme Roberts & Owen LLP, James D. Butler, Kenneth A. Wonstolen, Denver, Colorado, for Amicus Curiae Colorado Oil & Gas Association.

George N. Monsson, County Attorney, Fort Morgan, Colorado, for Amicus Curiae Colorado Counties, Inc.

Opinion by Judge CASEBOLT.

In this property tax case involving valuation of oil leaseholds, petitioner, Petron Development Company, and intervenor, Mary E. Huddleston, the Property Tax Administrator (PTA), appeal the order of the Board of Assessment Appeals (BAA) upholding the valuations affirmed by respondent, the Washington County Board of Equalization (CBOE). We reverse and remand.

Petron operates ten oil wells on six leaseholds located in Washington County. Each well consists of equipment that extracts an emulsion of oil, gas, water, and other impurities from an underground reservoir and brings it to the earth's surface. The emulsion is then pumped through various pieces of equipment that inject chemicals to break down the emulsion, remove water, and separate or settle the contents. The material is finally piped to storage tanks or "tank batteries" to await final transportation by truck.

As required by § 39–7–101, C.R.S.2002, Petron filed statements with the county assessor for tax year 2001, reporting the value of the oil sold from the leaseholds during the preceding calendar year. Because the oil produced from the wells was sold at the tank battery downstream from the point it exited the ground, and because § 39–7–101 requires the operator to report the selling price of the oil at the wellhead, which Petron interpreted to mean the value of the unprocessed material at the point it exited the ground, Petron used a "netback" method of valuation. Thus, it reduced the sale price by the costs it incurred for gathering, transporting, manufacturing, and processing the material downstream from the point the oil exited the ground.

The assessor refused to allow these deductions. Instead, the assessor valued the leaseholds based upon the amount of gross

lease revenues; that is, he construed the selling price at the wellhead to mean the selling price at the tank batteries. The assessor took the position that the material was unprocessed at the point of delivery from the tank batteries because it remained crude oil and that there were no gathering, transportation, manufacturing, or processing costs incurred here. The assessor reached that conclusion in part because the claimed deductions did not arise beyond the well site, which he understood was required before a netback valuation method could be employed.

Petron appealed the assessor's valuation to the CBOE, which affirmed. Upon Petron's further appeal to the BAA, the parties stipulated to costs Petron incurred for gathering, transporting, manufacturing, and processing the oil, agreeing that such deductions from the sale price would be appropriate if the BAA allowed them.

The BAA declined to allow the deductions and affirmed the assessor's valuation. In doing so, the BAA interpreted statutory provisions and the PTA's guidelines and concluded that the sale at the tank battery was not a downstream point of sale for purposes of allowable netback deductions, but rather was a sale at the wellhead. This appeal followed.

### I.

■ Petron contends that the BAA erred in upholding the assessor's valuation based on the amount received for the oil at a downstream point of sale, without allowing deductions for the costs of gathering, transporting, manufacturing, and processing the oil. Specifically, it asserts that the BAA's decision violates the constitutional requirement that valuations of oil leaseholds be based on the value of the unprocessed material, violates the statutory requirement that valuations be based on the selling price at the wellhead, and contravenes the PTA's guidelines. We agree.

■ In reviewing an agency's action, a court must determine all questions of law, interpret constitutional and statutory provisions, and apply its interpretation to the facts as found or established. Interpretation of constitutional, statutory, and regulatory pro-visions presents a question of law; hence our review is de novo. *See United Parcel Serv., Inc. v. Huddleston,* 981 P.2d 223 (Colo.App. 1999).

■ A decision of the BAA may be set aside if it reflects a failure to abide by the statutory scheme for calculating property tax assessments. *City & County of Denver v. Bd. of Assessment Appeals,* 848 P.2d 355 (Colo.1993).

■ When interpreting a constitutional, statutory, or regulatory provision, we look to the ordinary and common meaning of its language, giving effect to every word and term whenever possible. *See Welby Gardens v. Adams County Bd. of Equalization,* 71 P.3d 992 (Colo.2003); *Bd. of County Comm'rs v. Vail Assocs., Inc.,* 19 P.3d 1263 (Colo.2001); *Regular Route Common Carrier Conference v. Pub. Utils. Comm'n,* 761 P.2d 737 (Colo.1988); *Bd. of County Comm'rs v. City & County of Broomfield,* 62 P.3d 1086 (Colo.App.2002). If the language is clear and unambiguous, examination of legislative history is unnecessary. *See Town of Telluride v. Lot Thirty–Four Venture, L.L.C.,* 3 P.3d 30 (Colo.2000).

■ When interpreting a tax statute, a court may not extend its operation by analogy or beyond the clear import of the language used, and all doubts are resolved in favor of the taxpayer. *Transponder Corp. v. Prop. Tax Adm'r,* 681 P.2d 499 (Colo.1984).

■ The tax at issue here is imposed upon lands or leaseholds and is considered a real property tax. *See* § 39–1–102(14)(b), C.R.S. 2002. Accordingly, the county tax assessor must value for assessment the oil-producing leaseholds and lands that are located within county boundaries. *See* § 39–1–103(2), C.R.S.2002; *Bd. of County Comm'rs v. City & County of Broomfield, supra.* The statutory formula for valuing the oil and gas leasehold is intended to gauge the value of the oil in the ground and is not a tax on the amount of oil actually produced. *See Fed. Land Bank v. Bd. of County Comm'rs,* 788 F.2d 1440 (10th Cir.1986).

Colo. Const. art. X, § 3(1)(b) provides, in pertinent part:

[T]he valuation for assessment for ... lands or leaseholds producing oil or gas, as defined by law, shall be a portion of the actual annual or actual average annual production therefrom, based upon the value of the unprocessed material, according to procedures prescribed by law for different types of minerals.

Thus, the constitution delegates to the General Assembly the task of specifying the valuation procedure, but expressly requires that valuation be based on the worth of the "unprocessed material." Accordingly, we must determine the meaning of "unprocessed."

The plain meaning of "processing" is "subject[ing] to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result ... to prepare for market, manufacture, or other commercial use by subjecting to some process." *Webster's Third New International Dictionary* 1808 (1976); *see Bd. of County Comm'rs v. City & County of Broomfield, supra* (applying dictionary definition to constitutional provision to determine meaning); *see also State v. Four States Drilling Co.*, 278 Ala. 273, 177 So.2d 828 (1965)(for purposes of tax statute, processing began when power oil and demulsifier were added to make production oil flow more easily and to start the process of making production oil into a marketable product).

The constitutional provision requiring valuation to be based on the value of the unprocessed material is implemented by § 39–7–101, et seq., C.R.S.2002. Review of that statute reinforces this plain meaning.

Section 39–7–101(1), C.R.S.2002, requires the leasehold operator or owner to file an annual statement including the "selling price at the wellhead" of the oil or gas sold from the land during the preceding calendar year. "Selling price at the wellhead" is defined in § 39–7–101(1)(d), C.R.S.2002:

As used in this article, "selling price at the wellhead" means the net taxable revenues realized by the taxpayer for sale of the oil or gas, whether such sale occurs at the wellhead or after gathering, transportation, manufacturing, and processing of the product. The net taxable revenues shall be equal to the gross lease revenues, minus deductions for gathering, transportation, manufacturing, and processing costs borne by the taxpayer pursuant to guidelines established by the administrator.

Thus, the statute indicates two locations where the sale may occur: at the wellhead itself or at some other point after gathering, transporting, manufacturing, and processing. "Selling price at the wellhead" requires computation of the "net taxable revenues" realized by the taxpayer. That term is defined to allow deductions for, inter alia, "processing" costs to reach a "net" price.

The term "at the wellhead" generally refers to the point at the top or "head" of the actual well where the mineral product is severed or removed from the ground. *See Schroeder v. Terra Energy, Ltd.*, 223 Mich. App. 176, 179 n. 1, 565 N.W.2d 887, 890 (1997); Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 161, 1191 (11th ed.2000)(defining wellhead "as being at the Christmas Tree," which in turn is defined as "the assembly of valves, pipes and fittings used to control the flow of oil and gas from the casinghead").

The pertinent statutory provisions do not further define these terms. However, § 39–2–109(1)(e) & (k), C.R.S.2002, authorizes the PTA to create guidelines for administration, which provide additional direction.

To assist county assessors in valuing land for property tax purposes, the PTA prepares and publishes a land valuation manual known as the *Assessors Reference Library* (rev.Mar.2003) (*ARL*). *See* § 39–2–109(1)(e). A reviewing court gives deference to statutory interpretations contained in the *ARL*, but they are not binding. However, county assessors are bound by such interpretations. *Huddleston v. Grand County Bd. of Equalization*, 913 P.2d 15 (Colo.1996).

The *ARL* defines "manufacturing/processing" as "any activity occurring beyond the well site which changes the well stream physical or chemical characteristics, enhances the marketability of the stream, or enhances the value of the separate components of the stream," including activities such as dehydra-

tion, heating, treating, and separating. 3 *ARL* at 6.43. In our view, the *ARL* definition is consistent with the statutory and constitutional directives.

Here, the BAA concluded that removing water from the raw material and injecting chemicals did not constitute processing of the product, because it remained "crude oil." However, employing the definitions and rules of construction previously noted, we conclude that injection of chemicals, breakdown of the emulsion, and removal of impurities and water subject the oil to a particular method, system, or technique of preparation, handling, or other treatment designed to prepare it for market, and enhance the oil's marketability by changing its physical characteristics. That activity constitutes "processing." Merely because the oil remained "crude" and required further processing does not mean that it had not been subjected to some processing before it reached the tank battery. Hence, the BAA erred in determining that the oil was unprocessed at the tank battery.

For similar reasons, the BAA's conclusion that processing oil and making it marketable are mutually exclusive activities is erroneous. Not only does the definition of "processing" include "preparation for market," but also the constitution requires that valuation be based on unprocessed material, not marketable material.

Thus, the BAA erred in disallowing the claimed deductions.

This analysis and result is consistent with the nature of the tax imposed. The selling price of the oil at the wellhead is used to gauge the value of oil in the ground. *See Fed. Land Bank v. Bd. of County Comm'rs, supra.* Accordingly, the appropriate place to determine the selling price here is the point at which the oil exits from the ground, which the constitutional provision essentially mandates when it refers to the value of the "unprocessed material" and § 39–7–101 means when it refers to the "selling price at the wellhead." The statute intends the selling price at the wellhead to reflect revenues realized by the taxpayer for sale of the oil at the wellhead or the net taxable revenue after gathering, transportation, manufacturing, and processing of the product. Therefore, if the selling price of the oil at a point downstream of the wellhead is used to gauge the value of oil in the ground, deductions for intervening processing must be allowed to determine the value of the material when it exits from the ground.

## II.

■■■■ The BAA and the CBOE, however, assert that this interpretation is untenable because "wellhead" does not mean the point where the material exits the ground. Rather, in their view, it means the meter or point of sale, which in this case is the tank battery. In support of their argument, they point to the *ARL* definition of "wellhead" as "the point *beyond* the actual casinghead/tubinghead where the product is either processed at the well site or the unprocessed product is metered for transportation beyond the well site." 3 *ARL* 6.45 (emphasis supplied). Hence, they assert that the wellhead cannot be simply the top point of the well bore or "hole," but must be the tank battery, which is beyond the casinghead/tubinghead. We disagree.

First, the assertion that the wellhead is at the tank battery ignores the constitutional provision, which requires that the value of the oil reflect the worth of the unprocessed material. At the tank battery, the material involved here has already been subjected to some processing.

Second, the *ARL's* definition of "wellhead" as a point beyond the casinghead/tubinghead does not indicate *how far* therefrom the wellhead is. It could be a point immediately above the casinghead, a view consistent with the general definitions of "wellhead" previously stated. And as Petron asserts, this *ARL* definition can be read as merely confirming that costs associated with the actual "head" of the well are not deductible.

## III.

The BAA and the CBOE point out that the *ARL* uses the term "beyond the well site" in the definition of "manufacturing/processing." *See* 3 *ARL* 6.43. In addition, the *ARL* definition of "gathering" employs similar lan-

guage, as does the definition of "transportation." *See* 3 *ARL* 6.43–6.44. And the BAA and the CBOE interpret the term "well site," which is not defined in the *ARL,* to refer to the entire leasehold. Hence, they assert that allowing deduction of expenses for gathering, manufacturing, processing, and transporting would be improper here because those expenses were not incurred "away from the well site." Again, we disagree.

■ The proposed construction of "well site" would violate the uniformity provision of Colo. Const. art. X, § 3, requiring uniform taxation. The uniformity required "is that all persons who are members of any class, or all property logically belonging in a given classification, shall receive equal treatment to that accorded all other persons or property in the same class." *Dist. 50 Metro. Recreation Dist. v. Burnside,* 167 Colo. 425, 430, 448 P.2d 788, 790 (1968); *see Telluride Co. v. San Miguel County Bd. of Equalization,* 962 P.2d 313 (Colo.App.1997)(similar properties, similarly situated, should be assigned consistent values to meet constitutional requirements).

Leased parcels vary in size, from a few acres to hundreds, and encompass different numbers of wells. Hence, gathering, transporting, manufacturing, and processing activities are not uniform among leaseholds. Some of these activities may occur within the leasehold boundaries, especially on larger leases, while others may be conducted solely off site. Construing the term "well site" as a geographic requirement encompassing the entire leasehold would result in unequal imposition of property taxes. Oil and gas producers able to gather, transport, manufacture, and process material entirely on their leaseholds would incur higher taxes, while those with smaller leaseholds would have lower taxes as a result of the deductions simply because they engage in such activities elsewhere, even though the activities would yield the same product.

Thus, because we must give regulations and statutes an interpretation that renders them constitutional, *see People v. Hickman,* 988 P.2d 628 (Colo.1999), we reject this argument.

### IV.

We also conclude that allowing deductions here is consistent with the methods of valuation described in the *ARL.* In recognizing that oil producers may have different points of sale, the *ARL* contains a prioritized listing of wellhead pricing procedures, that is, methodologies for the valuation of leaseholds.

According to the *ARL,* if the preferred valuation method of determining the selling price of oil at a specific, actual wellhead (the "wellhead" method) cannot be used, valuation may instead be calculated downstream from the wellhead, using one of two "netback" methods. The first netback method is used when "unrelated parties [not related by blood, marriage, partnership, corporate identity, or the like] are paid for product gathering, processing, manufacturing and/or transportation services between the wellhead and the point of sale." Deductions for such activities are then calculated to determine the wellhead sales price. The second netback method is used if expenses are instead charged to the same or related party, in which case similar deductions are authorized. 3 *ARL* 6.30–6.41.

In other words, to determine the value of the unprocessed oil, the assessor must first attempt to calculate the sale price at the "head" of the well. However, if a sales agreement specifies a point of sale downstream therefrom, the assessor must allow deductions for the costs incurred by the taxpayer in gathering, transporting, manufacturing, and processing the oil between the head and the point of sale, using one of the two netback methods. This hierarchical valuation methodology ensures that regardless of the geographical point of sale, only the value of unprocessed oil is calculated for property tax purposes.

In this case, the assessor based the valuations on revenues received by Petron at the point of sale, the tank battery, after the oil had been subjected to some processing. The *ARL* specifies that in such a case, where the wellhead method of valuation is not appropriate, a netback method should be used. Regardless of Petron's relationship, the *ARL* specifies the allowance of deductions to ob-

tain the value of the unprocessed oil at the wellhead. Thus, according to § 39–7–101(1)(d), deductions should have been allowed for the gathering, transportation, manufacturing, and processing costs borne by Petron between the wellhead and the point of sale, here the tank battery.

For these reasons, we conclude that the BAA erred in determining that the price received at the tank battery was the selling price at the wellhead and in denying the deductions. Its conclusion is contrary to the constitutional requirement that valuation be based on unprocessed material, the plain language of § 39–7–101(1)(d), and the *ARL*.

In light of our disposition, we need not address the parties' remaining contentions.

The order is reversed, and the case is remanded to the BAA with directions to determine the appropriate amount of deductions allowable to Petron, consistent with the views expressed in this opinion.

Judge ROY and Judge PICCONE concur.