Petitioners: WASHINGTON COUNTY BOARD OF EQUALIZATION; Ronald L. Shook, in his official capacity as the Washington County Assessor; and The Colorado State Board of Assessment Appeals,

v.

Respondents: PETRON DEVELOPMENT COMPANY and Mary E. Huddleston, Property Tax Administrator for the State of Colorado.

No. 03SC787.

Supreme Court of Colorado.

March 28, 2005.

Berg Hill Greenleaf & Ruscitti LLP, Josh A. Marks, Heidi C. Potter, Boulder, Duncan, Ostrander & Dingess, P.C., James Birch (Special Counsel), Denver, for Petitioners Washington County Board of Equalization and Ronald L. Shook, in his official capacity as the Washington County Assessor.

John W. Suthers, Attorney General, John D. Baird, First Assistant Attorney General, State Services Section, Denver, for Petitioner Colorado State Board of Assessment Appeals.

Holland & Hart, LLP, Alan Poe, Greenwood Village, Marcy G. Glenn, Denver, for Respondent Petron Development Company.

John W. Suthers, Attorney General, Larry A. Williams, First Assistant Attorney General, Department of Revenue, Business and Licensing Section, Denver, for Respondent Mary E. Huddleston, Property Tax Administrator for the State of Colorado.

George N. Monsson, Morgan County Attorney, Fort Morgan, for Amicus Curiae for Colorado Counties, Inc.

Colorado Oil & Gas Association, Kenneth A. Wonstolen, General Counsel, Denver, for Amicus Curiae Colorado Oil & Gas Association.

HOBBS, Justice.

This property tax case involves the valuation of oil leaseholds for real property taxation purposes pursuant to Colorado law.[1] We granted certiorari to review the court of appeals' decision in *Petron Development Co. v. Washington County Board of Equalization,* 91 P.3d 408 (Colo.App.2003), allowing the deduction of certain processing costs on the leasehold site.[2]

---

1. *See* Colo. Const., art. X, § 3; § 39–7–101(1)(d), C.R.S. (2004).

2. We granted certiorari on the following issues:
   (1) Whether the further extraction and separating of crude oil from emulsion at an oil well

lease converts the product from unprocessed to processed for purposes of valuing oil producing leaseholds under Colorado Constitution Article X § 3(1)(b).
(2) Whether an oil producer's price that is received at a sale at the leasehold be the "sell-

The Colorado Constitution delegates the task of prescribing procedures for valuing oil to the General Assembly. Article X, section 3(1)(b) expressly requires that taxation be based on the value of the "unprocessed material." Colo. Const. art. X, § 3(1)(b)(1982). The General Assembly has required that "[e]very operator of, or if there is no operator, every person owning any oil or gas leasehold or lands within this state ... [which] are producing or capable of producing oil or gas" shall file with the county assessor a statement showing "[t]he selling price at the wellhead." § 39–7–101(1)(d), C.R.S. (2004). We affirm the court of appeals' holding that processing costs occurring on the leasehold site are properly deducted from the sale price of the oil in valuing the unprocessed material at the wellhead, as provided by Colorado Constitution article X, section 3(1)(b) and section 39–7–101(1)(d), C.R.S. (2004).

## I.

Petron operates ten oil wells on six leaseholds located in Washington County. Each well consists of equipment that brings to the earth's surface unprocessed material consisting of fluids and gas. This equipment includes "downhole" equipment such as piping, casing, rods and underground pumps, and may include above-ground pumping equipment.

Once the unprocessed material reaches the surface at the casinghead,[3] it is transported to the heater-treater[4] and settling tanks that separate water and gas from the oil. Then the oil is transported to the tank battery for metering and storage until a hauler picks up the oil and transports it to a location specified by the purchaser. These activities that Petron conducts on the leasehold add value to the unmarketable product extracted at the wellhead by rendering it saleable; other operators conduct the same processing activities off their leasehold sites and deduct the processing costs to arrive at the value of the unprocessed material at the wellhead.

This case arose after Petron filed tax declaration schedules with Washington County pursuant to section 39–7–101, C.R.S. (2004). Petron used the "netback" method to report the wellhead selling price of its oil production for the year 2000. Petron did not seek to deduct the vertical costs associated with bringing the product to the earth's surface, but did seek to deduct horizontal costs associated with making the product marketable. In accordance with the "netback" method, Petron reduced the value of the oil at the downstream point of sale (the tank battery) by the costs incurred for gathering and processing activities that took place between the wellhead and the tank battery. Pursuant to the Washington County Assessor's written request, Petron provided the assessor with extensive documentation supporting the deductions claimed.

Thereafter, the assessor denied all Petron's deductions for gathering and processing costs, and issued assessments based on the gross lease revenues that Petron received at the outlet of the tank batteries located on Petron's various leases. Petron protested the assessor's valuations in accordance with section 39–5–122(2), C.R.S. (2004). The assessor denied the protest and Petron

ing price at the wellhead" for purpose of ad valorem taxes under C.R.S. § 39–7–101(1)(d). (3) Whether the term "well site" includes the separation and storage facilities of crude oil located at or near the well bore for purposes of defining deductions for manufacturing/processing, gathering and transportation in the Assessor's Reference Library Manual ("ARL")(rev.Jan.2001).

**3.** "Casinghead" is defined in 8 Howard R. Williams & Charles J. Myers, *Oil and Gas Law: Manual of Terms* 140 (2004) as "the head or top of the casing set in a well."

**4.** The term "heater-treater" is described in 8 Williams & Myers, *Oil and Gas Law* 482 n. 3 as:

[a] tall, cylindrically shaped upright unit connected to a tank battery serving producing wells, commonly used in oilfield production processes in order to separate water and other foreign substances from crude oil. At the bottom of the heater-treater is an automatic gas burner that heats the oil; as the temperature of the oil increases, the water and other contaminants separate from the oil and drop to the bottom of the heater. The contaminants are discharged from the heater-treater and the crude oil, without contaminants, is put into the production tank. *See Hartford Accident & Indem. Co. v. Champion Chemicals, Inc.*, 420 So.2d 1282 (La.Ct.App.1982).

appealed to the Washington County Board of Equalization ("Board") pursuant to sections 39–5–122(3) and 39–8–106, C.R.S. (2004). After the Board affirmed the assessor's valuation, Petron appealed to the Board of Assessment Appeals ("BAA") pursuant to section 39–8–108(1), C.R.S. (2004). The BAA affirmed the Board's order.

In accordance with sections 24–4–106(11) and 39–8–108(2), C.R.S. (2004), Petron appealed to the Colorado Court of Appeals, which reversed the BAA decision. The court of appeals ruled that Petron's deductions should have been allowed. It concluded that "wellhead," as used in section 39–7–101(1)(d), means "the point where the mineral product is severed or removed from the ground;" that the BAA's proposed construction of "well site" violates the uniformity provision of the Colorado Constitution; that the emulsion produced at the wellhead constituted "unprocessed" material; and that Petron's costs of breaking down the emulsion, removing water, and transporting the product to the tank battery were deductible "gathering" and "processing" costs. *Petron v. Washington County Bd. of Equalization*, 91 P.3d 408 (Colo.App.2003).

The Board and the BAA petitioned this Court for certiorari to review the court of appeals' decision.

## II.

■ We affirm the court of appeals' holding that processing costs occurring on the leasehold site to make the oil marketable are properly deducted from the sale price of the oil in valuing the unprocessed material at the wellhead, as provided by Colorado Constitution article X, section 3(1)(b) and section 39–7–101(1)(d), C.R.S. (2004).

### A. Standard of Review

■ The application of a constitutional standard to a particular case is a question of law that we review de novo. *Greenwood Vill. v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 440 (Colo.2000). We accord a presumption of constitutionality to statutes that implement provisions of the Colorado Constitution. *Id.* at 440. This pre-sumption reflects the premise that legislative and executive branches of government validly observe and effectuate constitutional provisions in exercising their powers. *Id.* The party challenging the constitutionality of a statute carries a heavy burden to demonstrate a statute's unconstitutionality. *Id.*

■ Only the judicial branch holds the ultimate authority to construe the constitution's meaning. *Bd. of County Comm'rs v. Vail Assocs.*, 19 P.3d 1263, 1272 (Colo.2001). In discharging our judicial function, we afford the language of constitutions and statutes their ordinary and common meaning; we ascertain and give effect to their intent. *Id.* at 1273. We construe their provisions as a whole, giving effect to every word and term contained therein, whenever possible. *Id.*

■ When construing Colorado constitutional and statutory taxation provisions, we apply fundamental principles contained in the Colorado Constitution's revenue provisions, statutes, and case law: (1) all private and real and personal property is subject to payment of its fair proportion of taxation necessary for governmental purposes; (2) the General Assembly's plenary taxation role includes providing definitions of taxable property and prescribing such regulations as will secure a just and equalized valuation for taxation of all property, real and personal, that is not exempt from taxation under the Colorado Constitution; (3) the General Assembly cannot refuse to exercise its taxation authority and must enact tax statutes so that governmental operations may be funded; (4) taxation across a class of property must be uniform, though not necessarily exact or mathematically precise; (5) classifications of property types must be reasonable; and (6) the General Assembly has authority to address methods of valuation and differences in uses to be employed in assessing value for taxation purposes within a class of property. *Id.* at 1273, 1276, 1279; *Dist. 50 Metro. Recreation Dist. v. Burnside*, 167 Colo. 425, 448 P.2d 788, 790 (1968); *see also* Dale A. Oesterle & Richard B. Collins, *The Colorado State Constitution: A Reference Guide* 232–35 (2002).

■ If the General Assembly's taxation implementing statute is clear and unambiguous, examination of the statute's legislative history is unnecessary. *Vigil v. Franklin,* 103 P.3d 322, 327 (Colo.2004). We give substantial deference to valuation and assessment methods and procedures the General Assembly establishes. *Bd. of Assessment Appeals v. Sonnenberg,* 797 P.2d 27, 29 (Colo. 1990).

■ The Colorado Division of Property Taxation and the Property Tax Administrator have significant roles in defining and implementing valuation, assessment, and levy procedures. *Vail Assocs.,* 19 P.3d at 1279 n. 22. While they do not bind our construction of the applicable law, we consult and ordinarily defer to the implementing agency's guidance, rules, and determinations, if they accord with the constitutional and statutory provisions they implement. *Lobato v. Indus. Claim Appeals Office,* 105 P.3d 220, 223–24 (Colo.2005).

■ In construing tax provisions, we do not extend the statute's operation beyond its clear import, or deprive the taxpayer of a legitimate favorable construction of the statutory or regulatory provision at issue. *Transponder Corp. of Denver v. Prop. Tax Adm'r,* 681 P.2d 499, 504 (Colo.1984). Nevertheless, the property is subject to payment of its fair proportion of taxation determined in accordance with law. *City & County of Denver v.*

*Bd. of Assessment Appeals of Colo.,* 30 P.3d 177, 180 (Colo.2001).

## B. Colorado Constitution Article X, Section 3(1)(b)

The controlling provision of the Colorado Constitution applicable to this case is article X, section 3(1)(b), which provides that the valuation of a producing oil or gas leasehold for taxation purposes is "based upon the value of the unprocessed material."

> [T]he valuation for assessment for ... lands or leaseholds producing oil or gas, as defined by law, shall be a portion of the actual annual or actual average annual production therefrom, *based upon the value of the unprocessed material,* according to procedures prescribed by law for different types of minerals.

Colo. Const. art. X, § 3(1)(b) (emphasis added).[5]

■ The Colorado electorate adopted this provision in 1982 by referendum as part of a more general overhaul of the constitution's valuation and assessment provisions for property taxation.[6] The court's duty in interpreting a constitutional amendment is to give effect to the will of people. *In re Interrogatories Relating to the Great Outdoors Colorado Trust Fund,* 913 P.2d 533, 538 (Colo.1996).

The Legislative Council's analysis of measures for the 1982 election contains the brief and plain statement that, if the voters ap-

---

**5.** The Colorado Constitution requires that:

> [e]ach property tax levy shall be *uniform* upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax. The *actual value of all real and personal property* not exempt from taxation under this article *shall be determined under general laws,* which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of all real and personal property not exempt from taxation under this article.

Colo. Const. art. X, § 3(1)(a) (emphasis added.)

**6.** A Citizens' Committee assisted the General Assembly with the drafting of the constitutional amendment. The committee included the Property Tax Administrator and represented a diverse constituency, including assessors, commercial businesses, agricultural land owners, private

industry, and residential homeowners. Hearings on HCR 1005 Before the Senate Finance Committee, 53rd Gen. Assembly, 2nd Sess. (March 23, 1982)(statement of Representative Kirsch). In testimony before the Senate Finance Committee, one representative from the Citizens' Committee commented that the amendment was intended to resolve the inequality that had developed between different property classes such that homeowners were carrying most of the tax burden. Hearings on HCR 1005 Before the Senate Finance Committee, 53rd Gen. Assembly, 2nd Sess. (March 24, 1982).

The Citizens' Committee devised a package to deal with the valuation problem that proposed limits in the constitution; changed the composition of the State Board of Equalization; granted authority to the property tax administrator; and provided an enforcement mechanism that would require assessors to follow the law and provide greater equality and uniformity. *Id.*

proved the General Assembly's referred measure, the "valuation for assessment of producing mines and of lands or leaseholds producing oil or gas would be a portion of the value of the actual annual or average annual production of the unprocessed material." Legislative Council of the Colo. Gen. Assembly, *An Analysis of 1982 Ballot Proposals* 2 (Research Publ'n No. 269, 1982) ("Blue Book"). The arguments listed by the Legislative Council for the overall amendment emphasize: (1) providing stability and uniformity in the level of valuations across Colorado's counties; (2) limiting the authority of the General Assembly to adjust the level of assessment of various classes of property; (3) protecting the tax base of local governments; and (4) assuring residential, commercial, industrial, public utility, and agricultural property owners that the basic valuation for assessment would not change dramatically without a change in the state constitution. *Id.* at 6–7.

The arguments for the overall amendment do not contain a specific reference to its provision for basing mineral property taxation on the value of the unprocessed material. However, the arguments against the amendment criticize it on the basis that "the unprocessed material has little value." *Id.* at 9.

## C. Section 39–7–101(1)(d)

The Colorado General Assembly implemented the mineral "unprocessed material" provision of the Colorado Constitution when it enacted section 39–7–101(1)(d), C.R.S. (2004). In arriving at the wellhead value of the oil and gas unprocessed material for property taxation purposes, this law: (1) allows deductions from gross lease revenues for the gathering, transportation, manufacturing, and processing costs the taxpayer bears; and (2) provides for the Property Tax Administrator to adopt guidelines for valuation and assessment. The statute states that the "selling price at the wellhead" means

the net taxable revenues realized by the taxpayer for sale of the oil or gas, whether such sale occurs at the wellhead or after gathering, transportation, manufacturing,

and processing of the product. *The net taxable revenues shall be equal to the gross lease revenues, minus deductions for gathering, transportation, manufacturing; and processing costs borne by the taxpayer pursuant to guidelines established by the administrator.*

§ 39–7–101(1)(d), C.R.S. (2004) (emphasis added).

The Property Tax Administrator has authority to define allowable and non-allowable deductions to be considered in arriving at the actual selling price at the wellhead. The statute directs the administrator to prepare and publish manuals, appraisal procedures, and instructions concerning methods of appraising and valuing land;[7] and to prepare and publish guidelines concerning audit and compliance review of oil and gas leasehold properties.[8] To this end, the administrator prepares and publishes a land valuation manual, known as the *Assessor's Reference Library Manual* ("ARL").

### D. The Tax Administrator's Assessor's Manual

Under the statute, "[e]very operator of, or if there is no operator, every person owning any oil or gas leasehold or lands within this state . . . [which] are producing or capable of producing oil or gas" must provide an annual tax statement to the assessor of the county where the leasehold is located. § 39–7–101(1), C.R.S. (2004). This statement must include: leasehold location; operator's fractional interest; barrels of oil or quantity of gas delivered to the United States government; selling price at the wellhead; and information regarding the fractional interest of each interest owner taking production in kind. § 39–7–101(1)(a)–(e), C.R.S. (2004). The assessor's duty is to verify that the information provided in the statement is valid. § 39–7–105, C.R.S. (2004).

When this case arose, the Tax Administrator's Manual recognized that "each oil and gas producer may have different points of sale" and suggested a variety of methodologies for leasehold valuation. ARL, § 6.30

---

7. § 39–2–109(1)(e), C.R.S. (2004).

8. § 39–2–109(1)(k), C.R.S. (2004).

(rev.Jan.2001).[9] Priority was to be given to valuation based upon the "actual wellhead sales price" when there is "sufficient, reliable information" to determine that price. ARL, § 6.30 (rev.Jan.2001).

But this was not always possible. In these situations, the ARL provided that

[t]o determine what the 'selling price at the wellhead' would have been, oil and gas producers may deduct allowed expenses incurred in gathering, processing, manufacturing, and transporting the product to the point of sale from the gross sales price received at the downstream sales point.

*Id.* This is known as the "netback" method of determining the wellhead sales price.

Prior to 2004, assessors were encouraged to "use the wellhead pricing procedure that is most comparable to *how* and *where* the *product is sold* by the producer." *Id.* (emphasis added). They were to use the ARL and other administrative guidelines to make this determination. § 39–7–105, C.R.S. (2004).

Unfortunately, at the time of the Washington County Assessor's valuation at issue here, the ARL contained imprecise and contradictory provisions. In her brief and oral argument to us, the Property Tax Administrator clearly states that, in arriving at the taxable value for valuation, assessment, levy, and assessment of the property tax, the costs Petron incurred in separating the oil from the unprocessed material and storing it at the leasehold site for sale are deductible by law from the gross revenues Petron obtained from the sale.[10] We agree that this methodology accords with the Colorado Constitution and the implementing statute.

### E. Application to this Case

Article X, section 3(1)(b) expressly states that mineral valuation is based on the unprocessed material. To determine the meaning of "unprocessed material," which is not defined in the constitution, we look first for a common understanding of this term. Webster's dictionary defines "processing" as "subjecting to a particular method, system, or treatment designed to effect a particular result ... to prepare for market, manufacture, or other commercial use by subjecting to some process." *Petron*, 91 P.3d at 411 (*quoting Webster's Third New International Dictionary* 1808 (1976) (internal quotations omitted); *see Bd. of County Comm'rs v. City & County of Broomfield*, 62 P.3d 1086, 1088 (Colo.App.2002) (applying dictionary definition to constitutional provision to determine meaning); *see also State v. Four States Drilling Co.*, 278 Ala. 273, 177 So.2d 828 (1965) (for purposes of tax statute, processing began when power oil and demulsifier were added to make production oil flow more easily and to start the process of making production oil into a marketable product).

Typically, the unprocessed emulsified material removed from the ground is in the form of "wet oil." This is "[o]il containing such quantities of water as to render it unmarketable until the water is removed by treatment." 8 Williams & Myers, *Oil and Gas Law* 1181. Wet oil is subjected to various treatments that break it down; remove the water; and separate, settle or stabilize the product before it is transported to and stored in the tank battery until sold.

Such treatment of the raw material removed from the well is necessarily a part of processing oil for marketing. When Petron transported the material removed from the well to the heater-treater, it removed the water and then transferred the separated unrefined oil to storage tanks for metering and shipping. The Colorado Constitution and the implementing statute allow deduction of the costs of these processing steps from gross lease revenues in arriving at the value of the unprocessed material extracted from the well.

---

9. In accordance with the constitution and the implementing statute, the oil and gas taxpayer filing requirements in the January 2004 revisions of the manual make clear that the "[t]he netback wellhead selling price of all oil and gas sold or transported from the premises" is to be utilized for valuing the unprocessed material. *See* ARL, § 6.24 (rev.Jan.2004).

10. To rectify confusion in the ARL, the administrator made significant changes to it in 2004. These include: a revised definition of "wellhead;" a definition of "wellsite" which was absent from the previous version; a discussion of the historical context of wellhead pricing and the statutes; and illustrations showing the typical wellhead and the various netback valuation methodologies.

When Petron filed its annual statement, it used the netback method, claiming deductions for its gathering, processing and transportation costs pursuant to section 39–7–101(1)(d). It claimed direct operating costs of the heater-treater unit that extracts water and separates the "wet oil" into water and oil components and the costs of operating the storage tanks at the well site.

The Washington County Assessor concluded that the ARL did not provide for deduction of gathering, processing or transportation expenses [11] that occurred on the leasehold, only those that occurred away from the site. In accordance with this interpretation, the assessor valued Petron's six oil leaseholds in Washington County based on the gross amount of revenue Petron obtained for the oil at the tank battery.

The Property Tax Administrator, along with Petron, contends that Washington County's assessment of the Petron leaseholds contravenes the Colorado constitutional, statutory, and tax administrator provisions, and results in non-uniform treatment between taxpayers who conduct processing activities on the leasehold and those who do these activities away from the leasehold. We agree.

A well-established rule of statutory construction is that "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." § 2–4–101, C.R.S. (2004). In ascertaining the meaning of the section 39–7–101(1)(d) statutory phrase "selling price at the wellhead," we must define the word "wellhead." [12]

The common dictionary definition of "wellhead" is "the top of the well." [13] In the oil and gas industry it is the point at which the product emerges from beneath the earth's surface.[14] The court of appeals found this definition "consistent with the nature of the tax imposed." *Petron,* 91 P.3d at 412.

We conclude that the legislature, consistent with the constitution, intended "wellhead" to mean the physical location where the extracted material emerges from the ground.[15] The statute defines "selling price at the wellhead" as the "net taxable revenues realized by the taxpayer for sale of the oil or gas, whether such sale occurs *at the wellhead or after gathering, transportation, manufacturing, and processing* of the product. " § 39–7–101(1)(d), C.R.S. (2004) (emphasis added). In determining whether on-site processing costs are properly deductible in arriving at the wellhead value of the unpro-

11. In 2001, the ARL defined the terms "gathering, transportation, manufacturing, and processing" as follows:

"Gathering" means the movement, *away from the well-site,* of oil or gas products by separate and individual pipelines, of a relatively small size, to a point of accumulation, dehydration, compression, separation, heating, treating, storage or processing. For the purposes of these valuation procedures, "Gathering" is included within the term "Transportation."
"Manufacturing/Processing" means *any activity* occurring *beyond the well-site* which changes the well stream physical or chemical characteristics, enhances the marketability of the stream, or enhances the value of the separate components of the stream. Processing includes, but is not limited to fractionation, absorption, flashing, refrigeration, cryogenics, sweetening, dehydration, beneficiation, heating, treating, separating, stabilizing, or compressing.
"Transportation" means the costs incurred for any movement of a product beyond the gathering system, or *beyond the well-site* if no gathering system exists, by truck, rail, or pipeline. For the purpose of these valuation procedures, "Transportation" also includes "Gathering."

ARL § 6.43(rev. Jan. 2001) (emphasis added).

12. The 2001 version of the ARL defined wellhead as "the point beyond the actual casinghead/tubinghead where the product is either processed at the well-site or the unprocessed product is metered for transportation beyond the well-site." *See* "General Definitions," ARL § 6.43 (rev.Jan. 2001). The 2004 version has been modified to clarify that the wellhead is "the point at the surface of the wellbore where there are connections to the casinghead/tubinghead." ARL § 6.28 (rev.Jan.2004).

13. *Webster's New World College Dictionary* 1624 (4th ed.1999).

14. The industry also defines wellhead "as being at the Christmas Tree" which is the "assembly of valves, pipes and fittings used to control the flow of oil and gas from the casinghead." 8 Williams & Meyers, *Oil and Gas Law* 157.

15. We have applied the technical meaning of "wellhead" previously, in the context of royalty interests, and find it applicable here. *See, e.g., Garman v. Conoco, Inc.,* 886 P.2d 652, 657 (Colo.1994)(severance occurs at the wellhead).

cessed material, the essential lesson and practice of the industry is that there is no market for the material until the initial steps of processing the unprocessed material have occurred.

In the case before us, the selling price of the separated oil was established at the storage tanks. Because gathering, processing, and transportation occurred *before* the product was valued at the tank battery, those costs are properly deductible in arriving at the value of the "unprocessed material" at the wellhead.

In arguing against the deductibility of these costs, Washington County suggests an analogy between this case and *Rogers v. Westerman Farm Company,* 29 P.3d 887 (Colo.2001). In *Rogers,* we declined to follow the rule that gas is "produced" once physically severed and declined to adopt the reasoning adopted by other jurisdictions regarding deductibility of costs from royalty payments. *Id.* at 901.

The analogy between *Rogers* and this case is misplaced. Our decision in *Rogers* addresses royalty obligations under private gas leases. We applied common law principles of interpretation to contracts that were silent as to how the natural gas was to be valued for purposes of calculating royalties. The foundation of our analysis was the implied covenant to market, which rests on the perceived imbalance of bargaining power between working interest owners (lessees) and royalty interest owners (lessors) in the royalty context.

Our analysis of the contract relating to the allocation of costs incurred downstream of the physical wellhead between working and royalty interest owners under the gas leases in *Rogers* is not relevant in the context of the constitutional and statutory interpretation applicable here. The constitution does not call for assessment of the value of the "marketable product." Instead, it requires assessment of the "unprocessed material" produced from a parcel of land or a leasehold. In the royalty context, "oil and gas leases are strictly construed against the lessee in favor of the lessor." *Rogers,* 29 P.3d at 901. In the taxation context, the benefit of the doubt goes to the taxpayer.

In disallowing Petron's deductions, the Washington County Assessor determined that "gathering, processing, and transportation" expenses could not be deducted unless they occurred "away from" or "beyond" the leasehold property surrounding the well. Such a construction of the applicable law would result in non-uniform treatment of similarly-situated taxpayers within the same class and is contrary to both article X, section 3(1)(b) of the constitution and the legislature's implementing statute, which clearly states that the "selling price at the wellhead" is the "net taxable revenues realized by the taxpayer ... equal to the gross lease revenues, minus deductions for gathering, transportation, manufacturing and processing costs borne by the taxpayer." § 39–7–101(1)(d).

Although we recognize that Washington County may have based its assessment on confusing portions of an earlier ARL, we hold that Washington County must allow for deduction of processing costs on the leasehold site to comply with the constitutional and statutory provisions.

### III.

Accordingly, we uphold the judgment of the court of appeals.