COLORADO COURT OF APPEALS                                    **2017COA68**

---

Court of Appeals No. 16CA0860
Montezuma County District Court No. 14JV16
Honorable Douglas S. Walker, Judge

---

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of C.W.B., Jr., a Child,

and Concerning M.A.S.,

Respondent-Appellee,

and

J.S. and A.S.,

Intervenors-Appellants.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE DAILEY
Furman, J., concurs
Harris, J., dissents

Announced May 18, 2017

---

John Baxter, County Attorney, Ian MacLaren, Special County Attorney, Cortez, Colorado, for Petitioner-Appellee

Robert G. Tweedell, Guardian Ad Litem

Mark Reider, Cortez, Colorado, for Respondent-Appellee

The Law Office of Jill M. Carlson, LLC, Jill M. Carlson, Cortez, Colorado, for Intervenors-Appellants

Linda Weinerman, Executive Director, Dorothy M. Macias, Denver, Colorado, for Amicus Curiae Colorado Office of the Child's Representative

¶ 1    In this dependency and neglect proceeding, foster father J.S. and foster mother A.S. (Intervenors) appeal from the order denying the motion to terminate the parent-child legal relationship between M.A.S. (mother) and C.W.B., Jr. (child).  We affirm.

## I.    Background

¶ 2    In June 2014, mother brought the child, then ten weeks old, to the emergency room for investigation of a fever.  The child had undergone open heart surgery approximately six weeks earlier and had been scheduled to have a follow-up appointment that day, but C.W.B., Sr. (father) had cancelled the appointment.  The Montezuma County Department of Social Services (Department) was notified of possible child abuse when an examination revealed that the child had a broken femur and a skull fracture.

¶ 3    A petition in dependency and neglect was filed, and the child was placed in the home of the Intervenors.  Father and mother admitted that the child's environment was injurious to his welfare, and treatment plans were adopted for both of them.

¶ 4    Shortly thereafter, however, father pleaded guilty to domestic violence and child abuse charges, and received an eight-year prison sentence.  The Department then moved to terminate his parental

1

rights, and the court granted the motion. Although father's parental rights were terminated, mother continued to work on her treatment plan.

¶ 5    In April 2015, the Intervenors retained counsel and moved to intervene in the dependency and neglect proceeding. The court granted the motion, and thereafter the Intervenors participated fully in the proceeding.

¶ 6    In December 2015, the Department proposed that the child be moved to a new foster home, closer to mother's residence, to facilitate visits and foster the goal of reunifying the child with mother. In its report to the court, the Department observed that the Intervenors appeared to be in conflict with the goal of returning the child to his home, as they were "too attached" to the child and "want[ed] adoption to happen for them."

¶ 7    Later that month, however, the child's guardian ad litem (GAL) moved to terminate mother's parental rights on the basis that she had not reasonably complied with her treatment plan and was an unfit parent.

¶ 8    In May 2016, after a two-day hearing, the trial court denied the motion to terminate mother's parental rights, finding, among

other things, that the GAL had failed to prove that mother was unfit. The Intervenors now appeal from this judgment. The GAL did not appeal this decision, and the Department filed an opposition brief, asking this court to uphold the denial of the termination motion.

## II. Standing

¶ 9 Before we can address the merits of the Intervenors' contentions, we must determine whether they have standing to raise them. We conclude that they do.

¶ 10 Standing is a jurisdictional prerequisite that may be raised at any stage of the proceedings, including on appeal. *HealthONE v. Rodriguez,* 50 P.3d 879, 891 n.5 (Colo. 2002). If the parties do not raise the issue, the court may raise it sua sponte. *Romer v. Bd. of Cty. Comm'rs*, 956 P.2d 566, 586 (Colo. 1998).

¶ 11 We asked the Intervenors and the other parties to this case to submit supplemental briefs addressing whether the Intervenors have standing to prosecute this appeal. The Intervenors primarily argue that section 19-3-507(5)(a), C.R.S. 2016, which gives them an unconditional right to intervene in the termination proceedings,

also gives them a right to appeal any determination concerning the best interests of the child. We agree.

¶ 12    Whether the plaintiff has standing is a question of law that we review de novo. *Romer*, 956 P.2d at 586; *Weisfield v. City of Arvada*, 2015 COA 43, ¶ 7.

¶ 13    A party has standing if he or she (1) suffered an injury in fact (2) to a legally protected interest. *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004); *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

¶ 14    Here, the Intervenors have suffered an injury in fact, inasmuch as they were arguably positioned to adopt the child in the event the mother's parental rights had been terminated.

¶ 15    The question, then, is whether the Intervenors' injury was to a "legally protected interest" which would give them standing to appeal an adverse decision of the trial court. A "legally protected interest" is one recognized under the constitution, the common law, a statute, a rule, or a regulation. *Ainscough*, 90 P.3d at 856.

¶ 16    The Intervenors have no constitutionally protected liberty interest in their relationship with the child. *See Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 846 (1977); *M.S.*

*v. People*, 2013 CO 35, ¶¶ 16-21.  But section 19-3-507(5)(a) provides that "foster parents who have the child in their care for more than three months who have information or knowledge concerning the care and protection of the child may intervene as a matter of right following [a dependency and neglect] adjudication with or without counsel."

¶ 17    In *A.M. v. A.C.*, 2013 CO 16, the supreme court held that section 19-3-507(5)(a) gives foster parents the right to intervene and "participate fully" as parties "in the termination hearing without limitation." *Id.* at ¶ 20.  The court interpreted the statute as giving the foster parents the right to "make opening statements, cross-examine witnesses, introduce evidence, make evidentiary objections, and give closing argument," *id.* at ¶ 39, in order to "advocate for the child's best interests," *id.* at ¶ 19.  As we read the supreme court's opinion, the statute gives qualifying foster parents a right to represent the best interests of the child, and therefore a stake in the outcome of the controversy.

¶ 18    Because

- "[a]n intervenor, whether by right or by permission, normally has the right to appeal an adverse final

judgment by a trial court," *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375-76 (1987);

- the supreme court has determined that section 19-3-507(5)(a) gives qualifying foster parents a stake in the outcome of a termination proceeding and affords them the "full panoply of rights that the existing parties enjoy," *A.M.* at ¶ 17; and

- the typical parties to a termination proceeding (*i.e.*, the parents, the Department, and the child's GAL) all have the right to appeal from a trial court's termination order,

we conclude that the Intervenors have standing to appeal a decision in a termination proceeding.

¶ 19    Accordingly, we turn to the merits of the arguments on appeal.

### III.    Merits

### A.    Needs of the Child

¶ 20    The Intervenors first contend that the trial court abused its discretion by failing to give primary consideration to the physical, mental, and emotional conditions and needs of the child when denying the motion to terminate mother's parental rights.  They argue that the court disregarded "copious expert testimony"

regarding the emotional impact to a child if he is removed from his primary caregivers. We conclude that the court applied the correct legal standard in denying the motion.

¶ 21    Under section 19-3-604(1)(c), C.R.S. 2016, the parent-child legal relationship may be terminated upon finding by clear and convincing evidence that (1) the child has been adjudicated dependent or neglected; (2) an appropriate treatment plan has not been reasonably complied with by the parent or has not been successful; (3) the parent is unfit; and (4) the conduct or condition of the parent is unlikely to change within a reasonable time.

¶ 22    In deciding whether to terminate parental rights, a trial court bases its decision on the best interests of the child. *People in Interest of D.P.*, 160 P.3d 351, 356 (Colo. App. 2007). In making that determination, the court must give primary consideration to the physical, mental, and emotional conditions and needs of the children. § 19-3-604(3). "This is not to say, however, that the child's welfare is the only consideration. Nor does it imply that the child's welfare and the parents' interest in maintaining the parental relationship are in irreconcilable conflict." *People in Interest of E.A.*, 638 P.2d 278, 285 (Colo. 1981).

¶ 23   Rather, a determination of parental unfitness is intertwined with a determination of the child's best interests.  *K.D. v. People*, 139 P.3d 695, 700 (Colo. 2006).  An unfit parent is one whose conduct or condition renders him or her unable or unwilling to give the child reasonable parental care to include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions.  § 19-3-604(2).

¶ 24   A parent may *not* be determined to be unfit simply because he or she has made a mistake or is temporarily unable to meet the child's needs.  *See, e.g.*, *K.D.*, 139 P.3d at 700 (parental incarceration may be considered in determining whether a parent is unfit, but incarceration alone is an insufficient basis on which to terminate parental rights).  Nor is a parent unfit because another person can provide a "better" home for the child.  *See E.A.*, 638 P.2d at 285 ("A child's care and guidance preferably should be administered by his natural parents and the parental relationship should not be terminated simply because the child's condition thereby might be improved.").

¶ 25    "Termination is an unfortunate but necessary remedy when all reasonable means of establishing a satisfactory parent-child relationship have been tried and found wanting." *People in Interest of A.M.D.*, 648 P.2d 625, 640 (Colo. 1982).

¶ 26    Here, in a lengthy, detailed, and thoughtful order, the trial court found that there were reasons to be concerned about returning the child to mother, and reasons to prefer placing him permanently with his foster parents. The court noted that a parent-child interactional assessment, updated in March 2016, characterized the bond between mother and the child as "secure but fragile," and the assessor stated that the child would be at great risk of becoming emotionally disturbed if returned to mother's care.

¶ 27    The court also noted that additional concerns had been raised at the hearing on the motion to terminate mother's parental rights, such as that mother's uncle had recently been arrested in the parking lot of her apartment building with methamphetamine in his possession; the child sometimes "struggled" with visitation with mother; mother had reportedly been "around" a person known to the Department to be a sex offender; mother had made no effort to get her GED, and she was unemployed; and mother had recently

given birth to a new baby and concern had been expressed as to her ability to deal with the child while caring for the new baby. No such concerns arose with respect to the Intervenors, who were reported to be caring and extremely capable parents in whose home the child was doing well.

¶ 28 On the other hand, the court noted that there was substantial evidence that mother had complied with much of her treatment plan. She attended most of her mental health and substance abuse treatment and provided urine tests most of the time. She attended a domestic violence treatment group. The Department reported in November 2015 that she had completed her treatment plan. The expert she retained to perform a parenting capacity evaluation suggested that maintaining the parent-child relationship would be a worthwhile investment.

¶ 29 The trial court concluded that mother's treatment plan was appropriate, and, although she had not done everything that the plan required, she had substantially complied with it. Additionally, the court found that the evidence showed that mother could and would provide nurturing and protection adequate to meet the

child's physical, emotional, and mental health needs. Thus, the court stated that it could not find her unfit.

¶ 30 Summing up its reasons for denying the motion to terminate mother's parental rights, the trial court acknowledged that it was required to give primary consideration to the child's needs, but found that this was "not the only test that must be met." The court explained as follows:

> It may very well be true that a life with the foster family would be better for [the child] than life with his mother. However, this motion is not a custody battle between the two homes. The issue here is whether [mother's] parental rights should be terminated, not which of the two homes would be better or if [mother] is a perfect parent. The fact is that the statutory basis to terminate mother's parental rights was not met in this case.

¶ 31 We are satisfied that the court applied the correct legal standard in denying the motion to terminate mother's parental rights. To the extent that the Intervenors contend that the requirement that the court give "primary consideration" to the child's needs means that all other factors are secondary to the child's needs, including questions of parental fitness, we disagree. Colorado law requires that the child's needs and the parent's ability

11

to meet the child's needs be considered together. *K.D.*, 139 P.3d at 700 (the determination of parental unfitness is intertwined with a determination of the child's best interests).

### B.     *Conflict With Prior Orders*

¶ 32     The Intervenors next contend that the trial court abused its discretion in making a "final finding" that was contrary to other orders issued during the pendency of the case. Specifically, they argue that in denying the motion to terminate mother's parental rights, the court disregarded evidence regarding continued stress on the child, including the potential long-term implications of removal of the child from his primary caretakers in favor of recognizing mother's "partial compliance" with her treatment plan. This, they maintain, was contrary to an October 19, 2015, ruling in which the court reduced mother's parenting time due to concerns about stress to the child.

¶ 33     To the extent that the Intervenors contend that the court's denial of the motion to terminate mother's parental rights — after previously granting a motion to limit her visitation — was an abuse of the court's discretion because the child's needs should be the court's paramount concern, and all other factors should have been

treated as secondary, we have addressed their argument above and rejected it.

¶ 34    To the extent that the Intervenors intend to make a different argument, they have failed to describe specifically the trial court's abuse of discretion, and they have set forth no authorities in support of their contention that there was an abuse of discretion. Accordingly, the contention is not properly before us, and we will not attempt to address it.  *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (where appellant broadly asserts error, but does not identify supporting facts, make specific arguments, or set forth specific authorities to support his contention, the contention is not properly before the appellate court, and the appellate court will not address it).

### C.    *Expedited Permanency Planning Procedures*

¶ 35    Finally, the Intervenors contend that the trial court erred in refusing to require the Department to comply with the expedited procedures required under section 19-3-703, C.R.S. 2016.  We perceive no error.

¶ 36    When a proceeding concerns a child under the age of six, the child must be placed in a permanent home no later than twelve

13

months after the original out-of-home placement, unless the trial court finds that a permanent home is not in the child's best interests at that time. § 19-3-703; *People in Interest of B.C.*, 122 P.3d 1067, 1072 (Colo. App. 2005).

¶ 37    In determining whether a placement delay is in the best interests of the child, the court must be shown clear and convincing evidence that reasonable efforts were made to find the child an appropriate permanent home and such a home is not currently available or the child's mental or physical needs or conditions deem it improbable that the child would have a successful permanent placement. § 19-3-703.

¶ 38    Here, the trial court found that "the fact that the mother had additional time to complete her treatment plan, while frustrating the goal of expeditious planning and permanency, furthered the goal of reunification of the child with the mother." Although the court did not say so, reunification of the child with mother will provide the child with a permanent home. *See id.* ("For the purposes of this section, a permanent home shall include . . . the child's reunification with the child's parents."). Moreover, reunification serves the purposes of the Children's Code, as set

forth in section 19-1-102(1)(a), C.R.S. 2016: "To secure for each child subject to these provisions such care and guidance, preferably in his own home, as will best serve his welfare and the interests of society."

¶ 39 We conclude that the trial court's findings are adequate to show that there was good cause to delay permanency in this case.

## IV.    Conclusion

¶ 40 The order denying the motion to terminate the parent-child legal relationship between mother and the child is affirmed.

JUDGE FURMAN concurs.

JUDGE HARRIS dissents.

JUDGE HARRIS, dissenting.

¶ 41    In a thorough and well-reasoned opinion, my colleagues affirm the juvenile court's thoughtful order denying the motion to terminate mother's parental rights. My disagreement is not with my colleagues' treatment of the merits of this case; it is with their decision to reach the merits in the first place.

¶ 42    The foster parents (Intervenors) are the only parties appealing the juvenile court's order. The child's guardian ad litem (GAL) filed the motion to terminate mother's parental rights, over the objection of the Montezuma County Department of Social Services (Department), but has not appealed the denial of the motion. The threshold question is whether the Intervenors have standing to prosecute this appeal on their own. Because I conclude that they do not, I respectfully dissent.

## I.    *Procedural History*

¶ 43    A few additional facts are in order, as they highlight some of the procedural peculiarities that caution against allowing the Intervenors to proceed on appeal.

16

¶ 44 Shortly after the child was adjudicated dependent and neglected in July 2014, he was placed with the Intervenors who, by all accounts, have provided him with a loving and stable home.

¶ 45 Mother had a rocky start with her treatment plan, and by September or October, the juvenile court had changed the permanency plan from reunification to adoption by a third party. But in early 2015, mother changed course and began to engage in treatment. The Intervenors intervened in the case a few months later.

¶ 46 Mother continued to make progress with her treatment plan and, in June 2015, she moved to change the permanency goal back to reunification. The court set a hearing on mother's motion, but mother vacated the hearing after the Department, impressed with mother's progress in treatment and the strengthening bond between her and the child, voluntarily agreed to change the goal. In response, the GAL filed a motion to block the Department's visitation plan and to reschedule the permanency hearing.

¶ 47 At the rescheduled hearing in October 2015, the court ordered increased visitation for mother (without overnight visits), but did not formally change the permanency plan. The following month,

however, the Department reported that mother had successfully completed her treatment plan and that the permanency goal had changed from adoption back to reunification within six months, by March 2016.

¶ 48    In its December 11, 2015, report to the court, the Department stressed that the child "needs more time with his biological mother," and requested that the child move to a new placement closer to the mother's home.  The Department observed that the Intervenors had become an obstacle to reunification.

¶ 49    The GAL promptly filed a motion to terminate mother's parental rights.  Notwithstanding the GAL's motion, in mid-January 2016, the juvenile court modified the permanency goal back to reunification and ordered overnight visits between the mother and child.

¶ 50    Following a two-day termination hearing, at which the Intervenors, represented by counsel, fully participated, the court denied the GAL's motion, concluding that mother had substantially complied with her treatment plan and that the GAL had failed to prove that mother was unfit.

## II. The Requirement of Standing

### A. General Standing Principles

¶ 51    Colorado's standing requirement, like that employed in the federal courts, embraces both constitutional and prudential concerns. *City of Greenwood Village v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 436 (Colo. 2000). To give effect to both concerns, our standing rules require that a plaintiff demonstrate the he or she (1) suffered an injury in fact and that (2) the injury was to a legally protected interest. *Id.*; *see also Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

¶ 52    The first prong, the injury-in-fact requirement, has its roots in article VI, section 1 of the Colorado Constitution, which limits a court's jurisdiction to resolution of "actual controversies." *Hickenlooper v. Freedom from Religion Found., Inc.*, 2014 CO 77, ¶ 9. The existence of an injury in fact ensures that an actual controversy is presented so that the matter is proper for judicial resolution. *Id.* Although both tangible and intangible injuries can satisfy the injury-in-fact requirement, an injury that is overly indirect and incidental to the conduct at issue will not convey standing. *Ainscough v. Owens*, 90 P.3d 851, 856 (Colo. 2004).

¶ 53    The second prong, the legally-protected-interest requirement, promotes judicial efficiency. *See Hickenlooper*, ¶ 10. This prudential consideration recognizes that "parties actually protected by a statute or constitutional provision are generally best situated to vindicate their own rights." *City of Greenwood Village*, 3 P.3d at 437. Thus, the inquiry under this prong is whether the plaintiff has a claim for relief under the constitution, the common law, a statute, a rule, or a regulation. *Marks v. Gessler*, 2013 COA 115, ¶ 84.

¶ 54    In sum, the standing rules ensure that a specific controversy is presented to the court by a plaintiff with a "personal stake in the outcome of the controversy," *Baker v. Carr*, 369 U.S. 186, 204 (1962), while preventing intermeddlers from "trying to protect others who do not want the protection," and who may not believe that the litigation will further their interests, Erwin Chemerinsky, *Federal Jurisdiction* 57-59 (4th ed. 2003).

### B.    Intervenor Standing to Appeal

¶ 55    The Intervenors entered the proceedings pursuant to section 19-3-507(5)(a), C.R.S. 2016. Under this statute, foster parents who have had the child in their care for more than three months and who have information or knowledge concerning the care and

20

protection of the child may intervene as a matter of right in the termination proceedings. *See A.M. v. A.C.,* 2013 CO 16, ¶ 1.

¶ 56    Ordinarily, intervenors cannot entirely bypass the usual standing rules, as intervention as of right under C.R.C.P. 24 itself requires a direct, substantial, and legally protectable interest in the question at issue in the lawsuit. *Cf. Wis. Educ. Ass'n Council v. Walker,* 705 F.3d 640, 658 (7th Cir. 2013) (interpreting Fed. R. Civ. P. 24(a)).[1]  But when a statute confers an unconditional right to intervene — as section 19-3-507(5)(a) does for foster parents who have had the child in their care for the requisite period of time — intervenors need not prove a direct interest in the litigation, because the legislature has already declared their interest sufficient by granting the statutory right to intervene. *See Ruiz v. Estelle,* 161 F.3d 814, 828 (5th Cir. 1998).

¶ 57    Thus, the Intervenors could intervene as parties in the trial court, regardless of whether, in the absence of section 19-3-507,

---

[1] While Colorado's standing jurisprudence does not duplicate all the features of federal standing doctrine, similar considerations underlie both Colorado and federal standing law, and we frequently consult federal cases for persuasive authority. *City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 436 n.7 (Colo. 2000).

they could establish the direct stake in the outcome necessary to obtain standing.

¶ 58    But the mere act of intervening in the trial court does not confer automatic standing to appeal: "[S]tatus as a party does not equate with status as an appellant." *Diamond v. Charles*, 476 U.S. 54, 63 (1986). The constitutional prong of our standing test demands that an "actual controversy" persist throughout all stages of litigation. *See Hollingsworth v. Perry*, 570 U.S. __, __, 133 S. Ct. 2652, 2661 (2013). "That means that standing 'must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.'" *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997)); *see also In re Marriage of Shapard*, 129 P.3d 1007, 1009 (Colo. App. 2004) ("Standing is a jurisdictional prerequisite to any appeal."). Thus, in the absence of another party with standing, an intervenor's right to continue a suit — as opposed to his or her right to enter the litigation in the first instance — is contingent upon a showing that the intervenor independently fulfills the standing requirements. *Diamond*, 476 U.S. at 68.

¶ 59    To proceed with the appeal, then, the Intervenors must ultimately demonstrate an injury in fact to a legally protected interest.  And because standing to appeal is at issue, the Intervenors must demonstrate some injury from the judgment below.  *See Sierra Club v. Babbitt*, 995 F.2d 571, 575 (5th Cir. 1993); *see also* 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3902, at 63 (2d ed. 1992) (hereinafter Wright & Miller) ("The most obvious difference between standing to appeal and standing to bring suit is that the focus shifts to injury caused by the judgment rather than injury caused by the underlying facts."). [2]

¶ 60    In other words, a prospective appellant has a right to appeal a judgment only if he or she is "aggrieved" by it.  *City & Cty. of Broomfield v. Farmers Reservoir & Irrigation Co.*, 235 P.3d 296, 302 (Colo. 2010).  "Aggrieved" refers to a substantial grievance such as the denial of some claim of right, or the imposition of some burden or obligation.  *Id.* (quoting *Miller v. Reeder*, 157 Colo. 134, 136, 401

---

[2] Thus, contrary to the Intervenors' assertion, the potential denial of standing to appeal cannot constitute the requisite injury in fact sufficient to confer standing to appeal.  The injury must arise from the trial court's judgment or order.

P.2d 604, 605 (1965)). "Appeals are not allowed . . . to present purely abstract legal questions however important or interesting, but to correct errors injuriously affecting the rights of some party to the litigation." *Id.* (quoting *Miller*, 157 Colo. at 136, 401 P.2d at 605).[3]

¶ 61　　The Intervenors' standing to appeal therefore turns on whether the juvenile court's order preserving the mother's legal relationship with her child injuriously affected their rights. That inquiry, in turn, depends on the nature of the rights conferred under section

---

[3] *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 375 (1987), the case relied on by the majority for the proposition that an intervenor "normally has the right to appeal an adverse final judgment," is not inconsistent with the general rule that standing must be established at each stage of the litigation. The Court's pronouncement in *Stringfellow*, a case involving whether an order denying intervention as of right but granting permissive intervention is immediately appealable, means simply that an intervenor normally has the right to appeal a final judgment *adverse to it.* Indeed, the Court supported its statement with a citation to Moore's Federal Practice, which confirms that "[a]n intervenor may appeal from 'all interlocutory and final orders *that affect him . . . .*'" *Id.* at 376 (quoting 3B James William Moore & John E. Kennedy, *Moore's Federal Practice* ¶ 24-15, pp. 24-169 to 24-170 (2d ed. 1985)) (emphasis added). This is just another way of saying that an intervenor may appeal if he or she is "aggrieved" by the judgment.

19-3-507(5)(a) — the source of the rights that the Intervenors say they have been denied.

## III. The Intervenors Do Not Have Standing to Appeal Under Section 19-3-507(5)(a)

¶ 62     Section 19-3-507(5)(a) says "[p]arents, grandparents, relatives, or [qualifying] foster parents" have the right to intervene, which, according to our supreme court, means they can "participate fully" as parties "in the termination hearing without limitation," *A.M.*, ¶ 20.  Specifically, the statute gives intervenors the right to "make opening statements, cross-examine witnesses, introduce evidence, make evidentiary objections, and give closing argument."  *Id.* at ¶ 39.

### A. The Intervenors Have Not Suffered an Injury to the Procedural Rights Granted to Them by Section 19-3-507(5)(a)

¶ 63     If the statute confers only these procedural rights, the Intervenors suffered no injury in the trial court because they were not precluded from exercising these rights.  *Cf. Marks*, ¶ 87 (the plaintiff had standing to appeal dismissal of her administrative complaint and denial of a hearing where federal and state statutes conferred right to file a complaint and to participate in a hearing).  And, under those circumstances, the Intervenors do not have an

interest in the outcome of the case — *i.e.,* the placement of the child — but merely an interest in participation in the process by which the court arrives at the outcome.

¶ 64 A statute could certainly grant an intervenor the right to participate in a proceeding without granting an automatic right to judicial review of a final decision. In *Georgia Power Co. v. Campaign for a Prosperous Georgia,* 336 S.E.2d 790 (Ga. 1985), for example, the Georgia Supreme Court determined that a statute allowing a consumer group to intervene in proceedings on a utility's application for a rate increase did not necessarily confer standing to seek review of the administrative decision. *Id.* at 794. The court of appeals had concluded that the public policy of providing consumers adequate representation in proceedings affecting utility rates would be frustrated unless the court construed the statute as also granting parties to the proceeding an automatic right to judicial review. *Id.* at 793. But the supreme court disagreed, reasoning that giving intervenors party status, and allowing them to present evidence and cross-examine witnesses, effectuated, "in a manner unrelated to judicial review," the public policy of granting adequate representation to consumers in these types of

proceedings. *Id.* at 794. Thus, the court concluded, to establish a right to appeal, the consumer group had to show that it was actually aggrieved by the administrative decision. *Id.*

¶ 65    In my view, section 19-3-507(5)(a) similarly confers on Intervenors a right to participate in the proceedings, but not an automatic right to challenge the outcome. By granting intervenors party status, and the accompanying rights of "unlimited" participation at the termination hearing, the statute effectuates, in a manner unrelated to judicial review, a policy of encouraging participation in a dependency and neglect proceeding of all persons who might have relevant information, thereby promoting the accuracy of juvenile court decisions. As the Colorado Supreme Court has explained, the persons identified by the statute, including foster parents, are often "uniquely positioned to provide a juvenile court with the most up-to-date status of the child and the child's well-being." *A.M.*, ¶ 35; *see also People in Interest of M.D.C.M.*, 34 Colo. App. 91, 94, 522 P.2d 1234, 1236 (1974) (permitting foster parents to intervene after dispositional hearing because "their relationship with or particular knowledge concerning

the child[] can materially aid the court in its determination of what in fact is in the child's best interest").

¶ 66 The Intervenors fully participated in the proceedings. So, if full participation in the proceedings is the extent of the rights conferred by section 19-3-507(5)(a), the Intervenors are not "aggrieved" by the trial court judgment, because it did not deny them any claim of right or impose a burden or obligation. *City & Cty. of Broomfield*, 235 P.3d at 302; *see also State Bd. for Cmty. Colls. & Occupational Educ. v. Olson*, 687 P.2d 429, 435 (Colo. 1984) (standing requires the existence of a legal right or interest that has been violated).

*B.     Section 19-3-507(5)(a) Does Not Grant the Intervenors A Right to Assert the Child's Interests on Appeal*

¶ 67 To have standing to appeal the termination order, the statute must give the Intervenors more than a mere right to participate in the proceedings; it must give them a direct and substantial interest in the child's placement with a particular person. *See Hollingsworth*, 570 U.S. at __, 133 S. Ct. at 2662 (To have standing, the party must "possess a 'direct stake in the outcome' of the case." (quoting *Arizonans for Official English*, 520 U.S. at 64)).

¶ 68    As the Intervenors acknowledge, though, the statute does not give them any legally protected right to a continued relationship with the child. *M.S. v. People*, 2013 CO 35, ¶¶ 14-15 (state dependency and neglect statutes do not give pre-adoptive foster parents a constitutionally protected liberty interest in their relationship with the foster child).[4]  Thus, any injury[5] from the

---

[4] I recognize that foster parents may acquire, under other statutes, a legally protected interest in their relationship with a child placed in their care. *See M.S. v. People*, 2013 CO 35, ¶ 14 n.8 (noting that, with respect to a child who was available for adoption because the parental rights of both parents had been terminated, "[i]f the foster parents had initiated an adoption proceeding, then their claim of a liberty interest arguably could have been analyzed under the statutory framework for adoptions").  Still, I reject the Intervenors' argument that they acquired such an interest under sections 19-3-702 and -703, C.R.S. 2016, which require expedited permanency planning for children under the age of six.  According to the Intervenors, they gained a constitutionally protected liberty interest in continued contact with the child when the one-year permanency goal in section 19-3-703 was not achieved.  I disagree.  The statute does not create a liberty interest because it does not mandate a particular substantive outcome.  *M.S.*, ¶ 13.  Indeed, it does not even require permanency within one year, if the court determines that a delay in placement is in the best interests of the child, as the court did here.

[5] The majority says that the Intervenors suffered an injury in fact because they were "arguably positioned to adopt the child" in the event mother's parental rights had been terminated.  *Supra* ¶ 14.  In other words, according to the majority, the juvenile court's order injured the Intervenors by separating them from their foster child

juvenile court's order denying the motion to terminate would not be to the Intervenors' own rights, as required to establish standing. *See Hollingsworth*, 570 U.S. at __, 133 S. Ct. at 2662 ("To have standing, a litigant must seek relief for an injury that affects him in a 'personal and individual way.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992))); *see also In the Interest of Jackson E.*, 875 N.W.2d 863, 866-67 (Neb. 2016) (intervenor foster parents had a right to participate in the termination proceedings, but they lacked a right or interest in the subject matter of the controversy and therefore lacked standing to appeal order changing

---

(whom they had not taken any steps to adopt). I need not weigh in on whether separation from a foster child amounts to a legally cognizable injury (I have no doubt that it amounts to an "injury" as that word is commonly understood) because, even if it does, I conclude that any injury is not to a legally protected interest. Still, I am skeptical that, under these circumstances, the Intervenors can satisfy the injury-in-fact prong of the standing test. An injury in fact must be "direct and palpable," not speculative and remote, *Olson v. City of Golden*, 53 P.3d 747, 752 (Colo. App. 2002), or incidental to the judgment, *see Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977). The juvenile court's task was to determine whether mother had substantially complied with her treatment plan and whether she was unfit. Intervenors' separation from the child is one consequence of the court's denial of the motion to terminate mother's parental rights, but the injury is incidental to the order. Likewise, any loss of the Intervenors' right to adopt the child is incidental and indirect as well as speculative.

the foster child's placement); *In the Interest of G.C.*, 735 A.2d 1226, 1230 (Pa. 1999) (Given the "uniquely limited and subordinate, state-created, agency-maintained, foster parent/child relationship established through the [l]egislative scheme," the foster parents lacked standing to challenge the court's order placing the child with the grandfather.).

¶ 69     Still, the Intervenors say that even if the order did not affect their own rights, it affected the child's rights.  And, they say, section 19-3-507(5)(a) gives them a right to advocate for the best interests of the child in their care.  Therefore, according to the Intervenors, they have standing to challenge the juvenile court's determination that termination of parental rights is not in the child's best interests.

¶ 70     This is the argument that the majority finds persuasive.  It points to a single sentence in *A.M.* — "The General Assembly, having granted foster parents the ability to advocate for the child's best interests as intervenors, did not, in the same breath, confine that ability to a hearing in which there is no practical likelihood that foster parents would be able to participate," ¶ 19 — and concludes that the Intervenors have standing to litigate "best

31

interests" on behalf of the child. *Supra* ¶ 17. In other words, it effectively determines that the Intervenors have third-party standing to assert the child's interests on appeal.

¶ 71　I do not think that single sentence was intended to bear the weight that the majority places on it. And, it otherwise seems unlikely that section 19-3-507(5)(a) was intended to confer on intervenor-foster parents standing to assert the child's rights.

¶ 72　For one thing, "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." *Hollingsworth*, 570 U.S. at __, 133 S. Ct. at 2663 (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)); *see also People in Interest of J.A.S.*, 160 P.3d 257, 261 (Colo. App. 2007) (concluding that mother lacked standing to challenge court's findings that father was unfit); *People in Interest of E.S.*, 49 P.3d 1221, 1222 (Colo. App. 2002) (holding that mother did not have standing to raise issues concerning stepfather's party status and that stepfather did not have standing to raise issues concerning the adjudication of the child as dependent or neglected as to the mother).

¶ 73     This limiting principle takes on even greater import where, like here, one party seeks to advance the interests of a nonappealing co-party. *See, e.g., Jonida Trucking, Inc. v. Hunt,* 124 F.3d 739, 742 (6th Cir. 1997) (administrative law judge refused to permit claimant to withdraw his request for benefits from employer, and employee declined to appeal the ruling; employer lacked standing to appeal on behalf of employee); *see also Shapard,* 129 P.3d at 1009 ("A party does not have standing to appeal the portions of a judgment involving only the interests of a nonappealing party."). In these circumstances, courts are wary of an appellant purportedly asserting the interests of a party who has determined that an appeal is not in its best interests. *See* Wright & Miller § 3902, at 68-70. Both the Department and the GAL — who are statutorily obligated to look out for the safety and best interests of the child — have declined to pursue an appeal of the court's order, leaving only the Intervenors to insist that an appeal is in the best interests of the child.

¶ 74     Because of these concerns, a person asserting third-party standing must first demonstrate an injury to himself or herself, *see People v. Rosburg,* 805 P.2d 432, 435 (Colo. 1991), and, as I have

33

explained, the Intervenors have not identified any injury to their own legally protected interests.

¶ 75     Moreover, third-party standing usually applies to cases involving the deprivation of constitutional rights, *see State Bd. for Cmty. Colls.*, 687 P.2d at 440, and then only upon a showing that the third party will have difficulty asserting his or her own rights, *see, e.g., City of Greenwood Village*, 3 P.3d at 439 (third-party standing rule assumes that, absent a barrier to participation, a person with a direct interest at stake will assert his or her own rights).  The Intervenors contend that they are identically situated to the GAL and the Department, with the same stake in protecting the interests of the child.  Setting aside the inaccuracy of the contention — the GAL and the Department have statutory authority and duties not conferred on foster parents, *see, e.g.*, § 19-3-203, C.R.S. 2016; *see also* Chief Justice Directive 04-06, Court Appointments Through the Office of the Child's Representative, § V(B) (revised Jan. 2016) (outlining "unique statutory responsibilities of a GAL") — the contention itself undercuts the Intervenors' position: if the GAL and the Department are already representing the best interests of the child, it is unclear why the

Intervenors would also be specially charged with advocating for his interests, such that they could challenge the trial court's decision regarding termination of parental rights.

¶ 76    Sections 19-1-111(1) and 19-3-203, C.R.S. 2016, provide for the appointment of a GAL for every dependent and neglected child. The GAL, who must be an attorney, is the "official representative of the child." *People in Interest of G.S.*, 820 P.2d 1178, 1181 (Colo. App. 1991); *see also* § 13-91-103(4), C.R.S. 2016 (defining GAL).  In that capacity, he or she is expressly authorized to conduct investigations, participate in evidentiary hearings, make recommendations to the court concerning the child's welfare, and "appeal matters to the court of appeals or the supreme court." § 19-3-203(3).  Like the Department, the GAL may file a motion to terminate parental rights.  *A.M.*, ¶ 14 (citing § 19-3-604(1)(c), C.R.S. 2012).  Unlike the foster parents, the GAL's "client" is the "best interests of the child."  *L.A.N. v. L.M.B.*, 2013 CO 6, ¶ 26 (quoting § 19-3-203(3)).  Thus, the GAL owes fiduciary duties of loyalty and confidentiality to the child's best interests.  *Id.*

¶ 77    The Intervenors say that the GAL has "removed himself from the case" by failing to file an appeal of the juvenile court's order

denying termination, leaving no other party to advocate for the child's best interests. As a division of this court has recognized, however, "it is the guardian ad litem, and not any private intervenor, who continues to represent the child's interest" throughout the litigation. *G.S.*, 820 P.2d at 1181. A mere disagreement with the GAL's determination that foregoing an appeal is in the best interests of the child (a determination shared by the Department) does not amount to a showing that the child's interests are not represented.

¶ 78    Finally, third-party standing also requires that the person seeking standing have a "substantial relationship" with the third party. *See City of Greenwood Village*, 3 P.3d at 439. On the one hand, the Intervenors have cared for the child since July 2014 and have formed a strong bond with him, the importance of which I do not mean to diminish. But at the same time, the Intervenors' rights with respect to the child, unlike those of the natural parents, derive primarily from a contract with the Department whereby they agree to provide temporary care for the child and adhere to the Department's rules and, in exchange, the Department agrees to compensate them for their time and efforts. *See Smith v. Org. of*

*Foster Families for Equal. & Reform*, 431 U.S. 816, 845 (1977) (Unlike the natural family, which has "its origins entirely apart from the power of the State," the foster parent-child relationship "has its source in state law and contractual arrangements."); Dep't of Human Servs. Regs. 7.708.3-.4, 12 Code Colo. Regs. 2509-8 (specifying Department rules for care of foster children, including that foster parent must obtain written authorization from physician to dispense nonprescription medication to foster child, foster parent must provide an evening meal within fourteen hours of the morning meal, foster parent may not spank the foster child, foster parent must hold fire drills, and foster parent may not require foster child to participate in foster parent's religious activities); *see also In re Interest of Enyce J.*, 870 N.W.2d 413, 420 (Neb. 2015) (explaining that foster parents do not stand in loco parentis to foster child, as the department of human service's rules limit foster parents' role to "something that is decidedly less than that of a lawful parent").

¶ 79      While the foster parents play an important role in helping the Department satisfy its duty to safeguard the interests of vulnerable children within the state — in part, by participating fully in the termination proceedings in juvenile court — I do not believe that

foster parents have the substantial relationship with the foster child that would give them standing to challenge a court's order granting or denying a motion to terminate parental rights. Indeed, as the Department noted in this case, sometimes the interests of foster parents can conflict with the interests of the child in their care — not based on any bad intent but, to the contrary, because foster parents may become so attached to the foster child that it becomes impossible to separate their own interests from the child's best interests. *See Smith*, 431 U.S. at 821 (court appointed separate counsel for foster children to "forestall any possibility of conflict between their interests and the interests asserted by the foster parents" regarding lawfulness of procedures governing removal of foster children from foster homes). In my view, the potential conflict makes foster parents decidedly poor candidates to assert the interests of their foster children on appeal, particularly where no other party is advocating for termination of parental rights.

¶ 80      In light of these considerations, I am dubious that, by its single sentence in *A.M.*, the supreme court intended to announce a new rule granting third-party standing to foster parents under these circumstances. The issue upon which the court granted certiorari

review in *A.M.* was "[w]hether the court of appeals erred when it determined that the intervenor's cross-examination of witnesses concerning the 'care and protection' of the child during a termination of parental rights hearing exceeded the meaning of 'intervention,' pursuant to section 19-3-507(5)(a), C.R.S. (2009), and violated the parents' right to due process." *A.M.*, ¶ 7 n.3. In answering that particular question, the court held that, as intervenors, the foster parents were "properly permitted to make opening statements, cross-examine witnesses, introduce evidence, make evidentiary objections, and give closing arguments." *Id.* at ¶ 39. I do not read into that holding an additional, and entirely separate, ruling that foster parents have standing to prosecute an appeal, on their own, of the court's ultimate decision with respect to termination.

¶ 81    I am also hesitant to divine a new rule from an opinion that does not address the issue because the implications of such a rule are so far reaching. If foster parents have third-party standing to appeal from the denial of a motion to terminate parental rights, why wouldn't they have a right to file the motion to terminate parental rights in the first place? The fact that the supreme court has never

recognized the right of foster parents to file such a motion —

indeed, in *A.M.*, the court suggested that only the Department and

the GAL had the authority to file the motion, *see id.* at ¶ 14 (The

parent's failure to comply with the treatment plan may "provide

grounds for the State or the guardian ad litem to file a motion to

terminate parental rights.") — is further evidence, in my view, that

foster parents do not have standing to object to the court's

resolution of the motion. The right to file the motion and the right

to challenge the order would seem to go hand in hand. *See, e.g., In

re Parental Responsibilities Concerning M.W.*, 2012 COA 162

(mother's former boyfriend could appeal the denial of his petition for

allocation of parental rights under section 14-10-123(1), C.R.S.

2012, where boyfriend had express statutory right to file petition

seeking parenting time).

¶ 82    While section 19-3-507(5)(a) gives foster parents the right to

intervene and to participate fully in the termination hearing, I

conclude that it does not give the Intervenors third-party standing

to assert the rights of their foster child on appeal. And because I

have determined that the Intervenors cannot demonstrate an injury

in fact to their own legally protected interests, I conclude that they

lack standing to appeal the juvenile court's order.  Accordingly, I would dismiss the appeal.